## COOK v. THE STATE.

114 523
j120 301

1. A jury in passing upon a confession or an incriminating admission may, if they see proper, accept a part thereof as true and reject a part thereof as false.
2. The evidence in this case, though entirely circumstantial, was, in view of the above rule, sufficient to show beyond a reasonable doubt that the accused was guilty, and also to exclude every other reasonable hypothesis.

Argued January 20, — Decided February 3, 1902.

Indictment for murder. Before Judge Harris. Troup superior court. December 10, 1901.

*Longley & Longley,* for plaintiff in error. *J. M. Terrell, attorney-general,* and *T. A. Atkinson, solicitor-general,* contra.

LUMPKIN, P. J. The brief of evidence in the present case discloses that a colored man named Joe Tankersly lived alone in a house which contained a large room and a shed-room. On the night of the 1st day of February, 1901, this house was consumed by fire. In the early morning of the next day, the dead body of an adult human being was found amid the ruins of the shed-room. A pool of blood was discovered on the ground in front of the door of the house, and drops of blood were traced up to the very place where the door had been situated. Jack Cook, another colored man, was indicted for and convicted of the murder of Tankersly. At the trial there was testimony establishing the facts above stated. It further appeared that the corpse found in the ruins of the house was much charred and scarcely recognizable, but one witness undertook to swear positively that it was the body of Tankersly. There was also evidence tending to show that the accused had a grudge against Tankersly and had repeatedly threatened to do him injury. The coroner of the county, who on the trial was sworn as a witness for the State, testified: "I had this defendant here, Jack Cook, before the coroner's jury. He said he didn't know nothing about the killing. Said he didn't know anything; he said, 'a secret that nobody would find out but God.'" Another witness for the State, W. H. Harris, testified that while Cook was in jail, he made a free and voluntary statement to the witness, which the latter took down in writing. It was as follows: "On the night that Joe was killed, I fed my mule and went in to eat my supper; and when I came out to lock my crib door, I saw Joe at my stable. I made to the stable. Joe

jumped the fence and ran out across my peach orchard, not toward his house but towards Willis's. I went right straight to Joe's house. After crossing the branch, didn't follow the road, but cut off bend by going straight across the hill. I got a stick by Joe's cotton-house; looked like an old axe-handle. When I got to Joe's house, I went to house door and pushed it, and it would not open. I stood between the kitchen and house and waited until Joe came. I said, 'I beat you here.' He said, 'Yes, I went off and just got back.' I said, 'Yes, you just got back from my house; you were there trying to put something in my mule feed.' Joe said I was a liar. I said, 'I saw you and knew you.' Joe said, 'You lie.' I told him I knew it was him and he was determined to kill that mule. 'You and Willis had killed my cow and hogs and I bought a mule and now you are trying to poison it, or done done it.' I knocked him down with the stick; hit him first across his forehead and knocked him to his knees; then hit him again kinder across back part of his head; then kicked him several times in the hind parts. Then I left him, but when I got to his cotton-house he was groaning, so I got sorry and went back. I picked him up and let him stand awhile. I just supported him, and carried him in the house and lit the lamp and washed the blood off of his head. There was a big gash across the back of head. I got soot and spider webs and put it on to stop the blood. Got an old shirt and wrapped up his head and laid him on the bed. Got some old things and put under his head so that it wouldn't be too low, and covered him up and told him to be quiet till I came back, and I would go home and get some turpentine and rags and fix his head up good. Told him he made me do all this. I sot the lamp in a chair near the bed, near the door; then I pulled the door to and went home. If I had went back soon and not stayed at home so long, I could have saved Joe and the house too. When I got over there the house was all on fire, and I went back home. I did not sleep any that night." "Was any one with you?" "No, I did it myself." "Were you not afraid when the coroner's jury was questioning you?" "I had whiskey in me; a pint." "How did the house catch fire?" "Joe must have knocked the lamp out of the chair and set it on fire." "Do you know the sassafras stob where Joe fell, and how did all that blood get on it?" "Yes, that stob was there to prop the kitchen; and when I got sorry I went back to Joe; he was try-

ing to get up, holding to the stob and groaning." Harris further testified that, after making this statement, Cook requested him to go over to the court-house and tell the truth about it.

In the argument here counsel for the plaintiff in error insisted that the conviction was unlawful, (1) because there was no positive evidence of the corpus delicti; and (2) because, taking the evidence as a whole, it did not exclude every reasonable hypothesis except the guilt of the accused. The circumstantial evidence tending to identify the body of the deceased as that of Tankersly was overwhelming; and besides, as will have been noted, there was some positive testimony that the body found in the ruins of the house was Tankersly's. We therefore feel no hesitation in holding that the identity of the deceased was sufficiently established. On the main question: was the evidence, the same being entirely circumstantial, sufficiently strong to show beyond a reasonable doubt, and to the exclusion of every other rational hypothesis, that Tankersly was murdered by Jack Cook? we are of the opinion that it was. There were threats on the part of the accused indicating an intention to do the deceased great bodily harm. There was Cook's own free and voluntary statement to the effect that he did beat Tankersly almost to death, drawing from him a considerable quantity of blood. This statement was corroborated by the physical fact that blood was found before the house and traced up to it. The body of the deceased was found, not under the room in which was located the bed on which Cook said he had laid Tankersly after beating him into a state of helplessness, but amid the ruins of another and distinct part of the house. It is a well-settled rule of law that, in passing upon a confession or an incriminating admission, the jury may believe a portion of the same and reject the balance as false. Bearing this in mind, and taking into consideration all of the physical facts above recited, our conclusion is that the jury were warranted in finding that Tankersly was actually murdered; that the crime was committed by Cook; that the latter told a part of the truth as to his connection with the homicide, and in other respects made false statements concerning the same. It is a fair and reasonable inference from the testimony as a whole that the accused, after beating Tankersly until he was unconscious and unable to move about, conveyed his body into the shed-room and then burned the house for the purpose of concealing the crime; and that he did

not lay Tankersly on the bed, minister to his sufferings, and then go home with a view to procuring other means of alleviating his condition.   It was strenuously argued that as Cook was under no constraint to divulge anything about the matter, he should be given credit for telling the whole truth.   This by no means follows.   No man can tell what a guilty conscience may impel a criminal to do. Apparently Cook was under great mental constraint to tell something about the tragedy, but in so doing the principle of self-preservation may have restrained him from truthfully relating all that occurred.   The verdict necessarily embraced a finding that some of his statement was true and other portions of it false.   It was within the province of the jury to thus deal with the statement, and we are unable, after careful deliberation, to say that the conclusion they reached on the whole matter was not duly established by legal testimony, or that the trial judge abused his discretion in approving their finding.

<em>Judgment affirmed.     All the Justices concurring.</em>