MORROW *v.* THE STATE.

576

No. 6749.   April 3, 1929.   Rehearing denied June 13, 1929.

*Wilson, Bennett & Pedrick,* for plaintiff in error.

*George M. Napier, attorney-general, W. B. Gibbs, solicitor-general, T. R. Gress, assistant attorney-general,* and *S. C. Townsend,* contra.

Hill, J.   The grand jury of Camden County returned a true bill against Homer Simpson, Malcolm Morrow, E. G. Waller, and Mamie Lee Todd, charging them with the offense of murder by shooting C. A. Perry.   Malcolm Morrow was put upon trial in Glynn superior court.   The jury returned a verdict of guilty, without any recommendation, and he was sentenced to be electrocuted.   A motion for new trial was overruled, and he excepted.

Ground 4 of the motion for new trial assigns error because the court refused to permit counsel for the defendant, on his mo-

tion, to ask each of the jurors, on voir dire, questions other than those prescribed by the statute. Counsel requested that he be permitted to ask the jurors "if they have read the newspaper accounts of the two former trials; or have they discussed the case with either any member of the jury sitting in the Homer Simpson case, or any of the spectators who heard the evidence; and from that reading or discussion have they formed any opinion about the guilt of this defendant?" Counsel argued: "If they should answer in the affirmative, . . then they are not competent jurors." The court, in overruling the motion and request, made the following statement: "I have no desire in this case, or any other case, other than to see that the State and the defendant get a fair trial and what we usually term a square deal. I have a sort of contempt for the efforts that are often made to try a case before it reaches the jury, on the streets, by newspapers, hearsay, and things of that sort, and to build up a sentiment for or against a defendant who is to be tried. Such a thing may go to the extent of influencing the public in such a way as to prevent an absolutely fair and impartial trial, and especially is that true if men, and especially jurors, undertake to make up their minds and form a definite opinion as to a man's guilt or innocence. It is a bad practice, and yet it is perfectly natural for men to comment on newspaper reports of crime. It is perfectly natural for them to form some sort of an opinion about it in case it occurred as reported to them; it is an impossibility for a man not to have some sort of opinion of what he has heard; but to form that opinion on hearsay, which is not permissible in the courts, from newspaper reports, which though pretended to be reports of evidence is hearsay, it is not admissible on the trial of the case; it is not evidence; just what weight a man will give to it is an individual matter. Under our rule, however, an opinion based on hearsay and not on sworn testimony is not binding on any one, and it is supposed not to influence a man who is perfectly impartial and who enters upon the trial of a case that way. In this connection, I would say that if a man had what is termed a fixed opinion that would not yield to the testimony and would not enable him, after hearing the testimony, to give the defendant a fair trial, if a man felt that he couldn't give the defendant a fair trial under the evidence as introduced, he ought to disqualify, as was done by one juror in one of

these cases; he said, 'I don't think I could give him a fair trial.' Well, if he feels that way about it, he certainly ought not to go on the jury. However, the law of Georgia recognizes that a man might have some sort of an opinion on hearsay, may be form or express it, or both; and yet our law recognizes the rule that an intelligent juror who has no bias or prejudice on his mind, whose mind is perfectly impartial between the State and the accused, and who swears that he has not, from having seen the crime committed or from having heard any of the testimony delivered on oath, formed and expressed an opinion as to the guilt or innocence of the prisoner at the bar, I say our law assumes that that sort of a man is a qualified juror, even though he may have heard or read ever so much about the case; it is not under oath, it is merely hearsay, etc. I do not think the policy of our law and our practice encourages a departure from the voir dire questions. Therefore I, unless otherwise challenged, will let the case proceed with the usual questions."

This ruling and the remarks of the court were excepted to on various grounds, among others, that in his statement the court publicly intimated that there had been newspaper discussion with reference to the case and possibly jurors had formed opinions from that discussion, and suggested that if any juror had done so it was his duty to disqualify when the questions on the voir dire were asked him, etc. The Penal Code, § 1001, provides that on trials for felonies any juror may be put upon his voir dire, and certain questions therein set out shall be propounded to him; and when these questions are answered in such a way as to show the juror to be competent, no provision is made for asking any question other than those authorized by the statute. In *Lindsay* v. *State,* 138 *Ga.* 818 (76 S. E. 369), this court held: "Where jurors on their voir dire had so answered the statutory questions as to prima facie qualify themselves as such, the court did not err in refusing to allow counsel for the accused to make further examination of the jurors." And the Penal Code, § 1003, provides: "If [the juror is] found competent and not challenged peremptorily by the State, he shall be put upon the prisoner, and, unless challenged peremptorily by him, shall be sworn to try the case." And § 1004 provides that, "When a juror has been found competent as aforesaid, no other or further investigation before triors, or otherwise, shall be had, unless

upon newly discovered evidence to disprove his answer or to show him incompetent as aforesaid, which may be heard by the judge at any time before any of the evidence on the main issue is submitted; and if the juror is proved incompetent, the judge may order him withdrawn from the jury and cause another selected in the same manner as is above pointed out." So far as appeared, none of the jurors in the instant case were challenged by the defendant, but he only asked permission through his counsel to propound additional questions on the voir dire, which request was denied by the court. The exception taken to the remarks of the court in refusing to permit counsel for the defendant to ask additional questions is without merit. We see nothing in the remarks of the court that would be prejudicial to the defendant, and are therefore of the opinion that the court in so ruling did not commit error.

■ Ground 5 of the motion for new trial complains that while W. S. Van Daly, a witness for the State, was on direct examination, the court permitted him, over the objection of movant's counsel, to testify with reference to a certain statement made by the wounded man after the shooting, which statement was offered by the solicitor-general as a dying declaration of the decedent. It was objected to on the ground that no foundation had been laid for its introduction as a dying declaration, and that it had not been shown that the deceased at the time of making the statement was in a dying condition, or was conscious of such condition. The following was the testimony on preliminary examination of the witness by the State: "I live in Brunswick now. I recall having heard of the robbery of the State Bank of Kingsland. On that night I was at Fernandina, Florida. I stayed in Fernandina that night. I was going to Jacksonville. On my way to Jacksonville that night I found an automobile wrecked. I stopped at the wreck. There was some one at the wreck after I stopped. I don't know who it was. They left shortly after I got to the wreck. I asked if any one was hurt, and they said, no. There were three of them in the automobile. A Dodge closed car was wrecked. I made an investigation of the premises. I looked around the car to see if any one was hurt and happened to call if any one was hurt. I could not see under the car, and wanted to make sure, and some one behind me said, yes; and I told him to wait and let me get a light over there, and threwed a light over about forty feet from the car

and went over, and Mr. Perry was lying face down on the ground, and I told him to let me get him to the hospital, and he told me not to move him until he told me what had happened. He asked me who I was; he could not stand up. He told me he was shot in the back. He told me thought he was shot in the back, and he thought it had went in his intestines, and that he—I don't believe I am in position to say exactly what he did say. He gave as a reason for not wanting me to move him the fear that he would not be able to speak if I moved him. He says, 'Don't move me yet; I want to tell you about it, so you will be able to tell the authorities after you get me to Jacksonville.' He said he might pass out before we got to Jacksonville. I got out a pencil and paper to take his statement down, but it was raining so hard I couldn't, and I undertook to remember what he said to me. I then picked him up. Before that he told me he was too heavy a man for me to handle by myself, and I went out and tried to flag down several cars and they wouldn't stop when I waved them, and I went back and told him I thought I could, and I went back and helped him up to a little tree, and he held on to the tree until I went back and brought my car up as close as I could, and I went over to him to get hold of him, and his glasses fell off when I started to pick him up, and he first told me to pick them up, or not to break them, although he says, 'I don't think I will ever use them again,' and I moved his glasses and put him in my car, and I went on to Jacksonville." After this preliminary examination the court permitted the witness, over the objection above stated, to testify as to what the deceased said had occurred between the defendants and the deceased. It appears from other testimony in the case that the deceased lived about forty-eight hours after being shot.

In *Dumas* v. *State,* 62 *Ga.* 58, and in *Duren* v. *State,* 158 *Ga.* 735 (124 S. E. 343), this court held as we have quoted for the second headnote of this decision. See *Perdue* v. *State,* 135 *Ga.* 277 (69 S. E. 184); *Fitzpatrick* v. *State,* 149 *Ga.* 75 (99 S. E. 128); *Washington* v. *State,* 132 *Ga.* 218 (73 S. E. 512); *Green* v. *State,* 154 *Ga.* 117 (113 S. E. 536); *Young* v. *State,* 114 *Ga.* 849 (40 S. E. 1000). In the instant case the court heard the preliminary investigation and admitted the declarations, and in his charge instructed the jury with reference to the law of dying declarations; and we are of the opinion that the court did not err in so doing.

■ The court charged the jury, on the question of an alleged confession, as follows: "When testimony in the nature of an alleged confession is offered, . . it is for the jury to determine whether or not such alleged confession was in point of fact made; and if the jury believes there was a confession, then and in that event the following principles of law would govern the jury in determining the weight of such testimony with reference to an alleged confession: All admissions should be scanned with care, and confessions of guilt should be received with great caution. A confession alone, uncorroborated by other evidence, will not justify a conviction. To make a confession admissible it must have been made freely and voluntarily without being induced by another by the slightest hope of benefit or the remotest fear of injury." The above charge was not error for any of the following alleged reasons: "(a) that there was no evidence to authorize such a charge; (b) because the defendant was being tried for murder; and while he did make a confession admitting his guilt of the offense of robbery of the Bank of Kingsland, yet in whatever statement he made with reference to the killing of Perry he claimed that the killing was justified because of the assault made on him by Perry, and the statement was not a confession of guilt as to the killing of Perry; (c) because the court charged with reference to a confession, which means a confession of guilt of the charge against him; and while the defendant made a statement admitting the killing of Perry, yet he justified the killing because of the conduct of and the assault made upon him by Perry; therefore it was not a confession of guilt, and the judge erred in so charging; (d) because the court, in charging on the confession of guilt on the part of the defendant when there was no evidence to authorize such a charge, intimated to the jury that the defendant had confessed his guilt."

E. L. Acosta, a witness for the State testified in part as follows: "We finally located them at Lakeland, Florida. I went to Lakeland for the purpose of bringing them back. I found one was in the hospital and one in the city jail. Morrow was in the hospital. I went to the hospital where he was, with Joe Chaney and you. At the hospital the defendant made a statement to me. It was made freely and voluntarily, without the hope of reward or the fear of punishment. He told us he would tell us anything about it concerning himself, but that he didn't care to or wouldn't implicate

anybody in it except himself; he said there were other parties in it, but he wouldn't call their names or tell what they had to do with it; he told us that he and other parties had went up there and robbed the bank, and that he had shot Mr. Perry once or more; he didn't say whether he had shot him all three times or didn't, but he said he had shot him once or more, and he told us about coming back to Jacksonville and having the wrecks with the automobiles, and then going to Lakeland where he was caught. He never did name any other parties excepting himself; he told of other people in this robbery, but he never did name them; he told that he had been up there and had made arrangements with Mr. Perry a day or two previous to that, and had carried this prospective land buyer up there to look over this land, and when they got him out in the woods they stalled him until nearly dark, and then held him up with the expectation of carrying him back and robbing the bank, which they did do. He said they went back to the bank and had taken Mr. Perry in and opened the vault and got the money out. He said that out there in the woods Mr. Perry had got the knife out, and that he shot him. He said he didn't tell him when he first held him up; he hadn't told Mr. Perry what he wanted; that he just drew a gun on him, and that Mr. Perry got out of the car and got a knife out, and that he shot it out of his hand, and that later on after that he told him while they were carrying him to the bank what they wanted. He said Mr. Perry said if he had knew what they wanted that he wouldn't have had to have shot him." On cross-examination the witness testified: "Mr. Morrow said to me very frankly, 'I'm perfectly willing to tell my part of this, but I do not care to involve others.' He told me about it, and on investigation I found the facts to be that he told me practically the truth. I haven't come in contact with Mr. Morrow since the time he was brought up from Lakeland until one day last week I talked to him in the court-room in Camden. He was very free. I wasn't looking for any information at that time; we was just talking. But so far as his connection with this transaction was concerned he was open and frank. But there was nothing said that there was any work done on since that time, but he did talk freely about it at that time. And from my investigation he told the truth about it; apparently to me it was. I am quite positive that Mr. Morrow told me in this Lakeland conversation that he drew his pistol on Mr. Perry before Mr. Perry drew his knife."

The contentions set out above, which are all of the alleged errors in the excerpt from the charge given by the court, are without merit, when considered in the light of the above evidence. *Jones* v. *State*, 130 *Ga.* 274 (4) (60 S. E. 740) ; *Brown* v. *State*, 168 *Ga.* 282 (147 S. E. 519) ; *Webb* v. *State*, 140 *Ga.* 779 (2) (79 S. E. 1126). In his statement to the jury the defendant admitted the conspiracy and scheme to rob the bank; and no legal justification was shown for the killing, either by the evidence or the statement of the defendant. In *Gore* v. *State*, 162 *Ga.* 267 (134 S. E. 36), it was held: "Where three persons conspire to rob a merchant in a store, and one of the conspirators remains in an automobile in front of the store, with the engine running, in order that the three may speedily escape from the scene of the robbery, while the other two enter the store, and, in furtherance of the common design to rob, kill the merchant intended to be robbed, such killing is the probable consequence of the unlawful design to rob, and all the conspirators are guilty of murder, including the one in the automobile. It is not necessary that the crime of murder should be a part of the original design, but it is enough if it be one of the incidental probable consequences of the execution of their design, and should appear at the moment to one of the participants to be expedient for the common purpose. The intent of the actual slayer is imputable to his coconspirators."

The court charged the jury: "Should you find from the evidence, or from the defendant's statement, that the defendant made an admission or confession or statement as to the killing and how it was done, then you would not be authorized to take one part of the admission and ignore the other part; in other words, if the State relies upon the admission of the defendant, the admission must stand as a whole before you in your consideration of the case. The jury, however, in passing upon a confession or incriminating statement, may, if they see proper, accept a part thereof as true and reject a part thereof as false." It is insisted that the last sentence of the charge, that the jury might reject a part of the incriminating statement or confession and reject a part as false, was error for the following reasons: (a) it is not a correct principle of law, the law being that the jury would not have a right to believe a part of a confession or incriminating statement as true and reject a part thereof as false, and that if the jury believed one part they

584

must believe all, and if they reject a part they must reject all; (b) said charge is conflicting and confusing to the minds of the jury, the latter sentence being contradictory to the other portion of the paragraph and confusing to the jury; (c) said charge was harmful and prejudicial to the rights of the defendant; (d) because the court referred to an admission or confession or statement as to the killing and how it was done, but failed in any portion of his charge to draw the distinction between a confession and an admission. In other words, the court failed to tell the jury the difference between a confession and an admission or a statement." The above charge seems to be in the language used by this court in *Cook* v. *State*, 114 *Ga.* 523 (40 S. E. 703), where it was held: "A jury in passing upon a confession or an incriminating admission may, if they see proper, accept a part thereof as true and reject a part thereof as false." The charge complained of is not erroneous for any reason assigned.

■ Ground 8 of the motion for new trial complains of the charge of the court on the subject of conspiracy. The conspiracy had been proved both by evidence and the defendant's statement. It is not necessary to set out the excerpt from the charge of the court excepted to, but it is examined, and is not erroneous for either of the reasons assigned, to wit: " (a) Because the defendant in this case admitted the killing of Perry, the deceased, and it was error to charge the law of conspiracy as applied to him. (b) Because in said charge the court used the following language: 'and that in pursuance of such effort to rob the bank they held up the deceased with guns, and that this was done in pursuance of that general scheme to rob the bank and as one of the incidents of carrying out such scheme and purpose,' the error being in the use of the word 'they,' referring to all the defendants in the indictment, there being no evidence to authorize such a charge. The evidence clearly shows that if the deceased was held up by any one, it was done by the defendant, the evidence being that the defendant, Morrow, went to the car where Perry was, and invited him to get out, and the evidence differing as to whether Perry drew the knife first, or whether Morrow drew the pistol first; but certainly if there was any holding up, Morrow was the only one doing it. For this reason there was no evidence in the case to charge conspiracy. (c) Because the defendant admitted killing Perry in his statement, and

set up justification, claiming that he acted in self-defense; and for this reason it was error to charge the law of conspiracy as applied to this defendant." The charge is not erroneous for any of the foregoing assigned reasons. There is in the record abundant evidence to show conspiracy on the part of the defendant and the other three conspirators. The law of conspiracy, under the evidence and the statement of the accused, was therefore applicable to the defendant's case. The principle charged is supported by the ruling made in *Gore* v. *State,* supra, and other authorities.

■ The 9th ground of the motion for new trial is as follows: "Because the court in the entire charge failed to charge the jury section 63 of volume six of Park's Code, which section is as follows: 'The punishment of persons convicted of murder shall be death; but may be confinement in the penitentiary for life in the following cases: If the jury trying the case shall so recommend, or if the conviction is founded solely on circumstantial testimony, the presiding judge may sentence to confinement in the penitentiary for life. In the former case it is not discretionary with the judge; in the latter it is.' The failure of the court to charge said section of the Code was error, for the following reasons: (a) Because under the law the court is required to charge said section in all capital cases where the jury have the right to make a recommendation that the defendant be confined in the penitentiary for life instead of suffering the death penalty. (b) Because the jury in the trial of a capital felony have the absolute right, with or without any cause, to make the recommendation that the punishment shall be confinement in the penitentiary for life. (c) Because the court's failure to charge said section was prejudicial and harmful to the defendant. (d) Because in said case and under the issues made in said case the defendant through his counsel contended that even if the jury should convict him they ought to attach a recommendation for imprisonment for life, and because of the fact that the jury convicted the defendant without a recommendation it was extremely harmful and prejudicial to his rights."

The 10th ground of the motion is as follows: "Because the court erred in charging the jury as follows: 'If, upon a thorough consideration of the case and of all of the evidence and facts and circumstances as disclosed by the testimony, you should find the truth to be that the defendant has been shown to be guilty of

murder, then the form of your verdict would be, "We, the jury, find the defendant guilty;" and this verdict, without any further recommendation, would mean that the defendant would receive the death penalty. The jury would have a right to add to such a verdict, "and we recommend the defendant to the mercy of the court;" in which event his punishment would be imprisonment in the penitentiary for life.' The error complained of in the charge above quoted being the following words: The jury would have a right to add to such a verdict, "and we recommend the defendant to the mercy of the court." Said charge was error for the following reasons: (a) Because it is not the law. The jury have the right under the statute to recommend that the defendant's punishment in case of conviction be confinement in the penitentiary for life, and there is no provision of the law which requires or authorizes the jury to recommend the defendant to the mercy of the court; the law being that whenever a jury in a capital case of homicide shall find a verdict of guilty, with a recommendation of mercy instead of a recommendation of imprisonment for life, in cases where by law the jury may make such recommendation, such verdict shall be held to mean imprisonment for life; but the province of the jury in a capital case of this kind was to recommend that the punishment be imprisonment for life, and the judge should have instructed the jury to this effect. (b) Because the only time the question of punishment was referred to in the judge's charge was when he was giving them the form of the verdict; and after giving to the jury correctly the form of the verdict in the event they convicted the defendant when the death penalty would be meted out to the defendant, the judge said the jury would have a right to add to such a verdict, 'and we recommend the defendant to the mercy of the court.' In that event the punishment would be imprisonment for life. Said statement, 'The jury would have a right,' etc., was given to the jury, not as the law, but as a right, and the jury could properly construe this statement to mean that unless the jury thought the defendant was entitled to mercy, then they ought not to make such a recommendation. (c) Because it put a burden upon the defendant greater than authorized by law; the jury having a right, with or without cause and with or without any mitigating circumstances, to recommend that the defendant be punished by confinement in the penitentiary for life, and would

have a right to do so though they did not think he was entitled to mercy; and the court telling the jury that they could recommend him to the mercy of the court would naturally lead the jury to believe that unless they felt the defendant was entitled to mercy .they ought not to make such a recommendation. (d) Because the jury might feel that imprisonment for life as a punishment was as great or as severe as the death penalty, and not believe that the defendant was entitled to mercy; yet in this charge the court limited the jury to a recommendation to the mercy of the court. (e) Because in the argument of State's counsel in this case they mildly but firmly asked the jury not to show any mercy to this defendant, that he and his coconspirators had not shown mercy to Perry when they had him in the woods; and counsel for the defendant argued to the jury that in the event they did finally convict the defendant for the offense of murder, that under all the facts and circumstances they should recommend that he be imprisoned for life, counsel for defendant reading to the court in the presence of the jury as a part of his argument in conclusion the decision of the Supreme Court in the case of *Cohen* v. *The State,* 116 *Ga.* 573. Thus the question of punishment became an issue in this case, and the defendant was entitled to a correct charge on that question. (f) Because a jury might recommend that the punishment of a defendant be imprisonment for life when they would not feel like recommending the defendant to the mercy of the court, when their verdict might be construed to mean that they thought the defendant was entitled to mercy and not view it from the standpoint of entirely fixing punishment. (g) Because there is no law to authorize the jury to make such recommendation as referred to in the court's charge, but the law does permit a jury when finding a defendant guilty on a capital offense to follow it with a recommendation of mercy, which shall be construed by the court to mean life imprisonment. This recommendation is permissible only, and not authorized or required. The court in this case did not tell the jury that they could make a recommendation of mercy, but limited them to a recommendation to the mercy of the court; the statement or the charge of the court, being a greater requirement than that permitted by the statute, the words 'to the mercy' being of greater import than the words 'of mercy,' put a greater burden on the defendant than that authorized or directed by law. (h) Because in

a case of this character, when it is supposed that a great deal has been said about it and published in the newspapers, a jury would not feel like facing the public after having recorded a verdict in which they used the words, 'recommend the defendant to the mercy of the court,' which might indicate to the public that the jury, though believing the defendant guilty of murder, thought that there was something in the case that would authorize them in recommending the defendant to the mercy of the court; and by said charge the court put upon the defendant a greater burden than that authorized or permitted by the law."

These two grounds may be considered together. The 9th ground states only the first paragraph of § 63 of the Penal Code. The section 2 of division 4 of the act approved December 23, 1833, being "an act to reform, amend, and consolidate the penal laws of the State of Georgia" (Acts 1833, p. 143), states the definition of murder. Section 5 of the act declares: "The punishment of murder shall be death." See also Cobb's Digest, 783. In the Code of 1863, § 4220, it was declared, in part: "The punishment of murder shall be death, but may be confinement in the penitentiary for life, in the following cases: 1. By sentence of the presiding judge, if the conviction is founded solely on circumstantial testimony, or if the jury trying the traverse shall so recommend. In the former case it is discretionary with the judge; in the latter it is not." In section 1 of the act approved December 13, 1866, (Acts 1866, p. 150), it was declared: "That in all cases in which the penalty prescribed by law for any offense is death, the sentence may be commuted in conformity with the provisions of section 4220 of the Code." In 1872, while the law was as indicated above, a defendant was placed on trial for arson, being an offense under another statute for which the punishment prescribed was "death." The jury returned "a verdict of guilty, and recommended him to the mercy of the court." It was held by this court that "the recommendation of the prisoner to the mercy of the court did not authorize the court, under the law, to commute the penalty of death. The verdict, therefore, under the law applicable to this class of cases, in which the penalty of death may be commuted, was an illegal verdict, and should be set aside." *Johnson* v. *State,* 48 *Ga.* 116. The ground on which the decision was placed was that the verdict was indefinite. It was stated: "The verdict, under the

law, if they did not intend the punishment of death should be commuted, should have been a verdict of guilty generally. If the jury did intend, by their verdict, that the penalty of death should be commuted to imprisonment for life in the penitentiary, then, under the law, they should have so recommended." This decision was rendered at the January term, 1873. It was followed at the July term, 1873, in the case of *West* v. *State, 49 Ga.* 451.

At the time when the above decisions were rendered there was no statutory definition of the term "recommend to the mercy of the court," as applicable to any capital case. The principle ruled in the above decisions, while relating specifically to arson cases, would also apply in cases of murder. So by the act approved February 25, 1875 (Acts 1875, p. 106), it was declared: (Section 1) : "That whenever a jury in a capital case of homicide shall find a verdict of guilty with a recommendation of mercy instead of a recommendation of imprisonment for life, in cases where, by law, the jury may make such recommendation, such verdict shall be held to mean imprisonment for life. If, in any capital case of homicide, the jury shall make any recommendation where not authorized by law to make a recommendation of imprisonment for life, the verdict shall be construed as if made without any recommendation." (Section 2) "That in all capital cases other than those of homicide, when the verdict is guilty with a recommendation of mercy, such verdict shall be held legal, and to mean imprisonment for life." Section 1 of this law has been contained in the several Penal Codes of this State since its adoption, except the Code of 1882 (and that code was not adopted by the legislature), and now constitutes the second paragraph in § 63 of the Penal Code of 1910. Section 2 has also been included in the several codes, but need not be further mentioned. Section 4220 of the Code of 1863 was embodied in the Code of 1873 as § 4323. Subsequently to the rendition of the decisions in *Johnson* v. *State* and *West* v. *State,* supra, the act approved December 16, 1878 (Ga. L. 1878-9, p. 60), in section 1, expressly repealed § 4323, but did not repeal the above act of 1875 (*West* v. *State, 79 Ga.* 773, 4 S. E. 325), and substituted therefor the following: "The punishment for persons convicted of murder shall be death, but may be confinement in the penitentiary for life, in the following cases: If the jury trying the case shall so recommend, or if the conviction is

founded solely on circumstantial testimony, the presiding judge may sentence to confinement in the penitentiary for life. In the former case it is not discretionary with the judge; in the latter it is." This provision of law has been embodied in the several codes since its adoption, and now constitutes the first paragraph in § 63 of the Penal Code of this State.

The foregoing states the origin of both paragraphs of § 63. Both paragraphs are of force (West v. State, supra), one as fully as the other, and are to be given effect in cases to which they apply. They refer to the same matter, and must be construed together. In sub-stance the first paragraph confers upon the jury, in any case of conviction for murder, the right by their recommendation to reduce the punishment from death to "confinement in the penitentiary for life." The second paragraph in substance confers the same right, but does so in different language (West v. State, supra). In the second paragraph the reduction of punishment may be ac-complished by "recommendation of mercy" expressed in the ver-dict finding the defendant guilty. Such a recommendation so ex-pressed "shall be held to mean imprisonment for life." The sub-stance of the two paragraphs of the code section being as indicated, the judge may appropriately instruct the jury, with reference to a recommendation, in the language of the first paragraph or in the language of the second or in the language of both, and the jury may mold its verdict in the language of either of said paragraphs. An instruction in the language of the second paragraph will not amount to a restriction or limitation upon the right of the jury to recommend that the defendant be punished by imprisonment in the penitentiary for life, or tend to confuse the jury as to the effect of their recommendation. An instruction under the provisions of the second paragraph should be as explicit and as free from any kind of restriction or limitation upon the right or power of the jury to make a recommendation as it should be if the instruction were under the provisions of the first paragraph, no more nor less.

Concerning the power of the jury in regard to recommendations in the language of the first paragraph of § 63, it was said, in Tay-lor v. State, 105 Ga. 746 (31 S. E. 764): "It is further com-plained that the court charged the jury as follows: 'If the jury are satisfied beyond a reasonable doubt of the guilt of the defend-ant of the offense of murder, and do not desire that he should suffer

the death penalty, the form of your verdict would be, "We, the jury, find the defendant guilty, and recommend that he be imprisoned in the penitentiary for life." If the jury find that the evidence establishes beyond a reasonable doubt that the defendant is guilty of the offense of murder, and do not desire to reduce his punishment to imprisonment in the penitentiary for life, but do desire that he should suffer the death penalty, the form of your verdict would be, "We, the jury, find the defendant guilty."' And in charging further, in reference to a recommendation to life imprisonment, that 'It is not controlled by any rule of law or evidence; it is not controlled by anything except the wishes of the jury trying the case.' It was contended by the able counsel for the plaintiff in error that these clauses of the charge make the recommendation to imprisonment for life, or the refusal to so recommend, depend on the wishes of the jury, whereas such recommendation might be exercised by the jury in the quality of mercy, or be controlled in deference to some line of public policy. It is undeniably true that if, in returning a verdict of guilty where the facts authorize a conviction for murder, the jury, being actuated by a wish or desire to show mercy to the accused, incorporate in their verdict a recommendation to life imprisonment, or do so or fail to do so from motives of public policy, this is but an exercise of the right with which they are invested. But this power to recommend, and thus fix the punishment, does not necessarily arise from regard to public policy or a wish to exercise mercy. These reasons may influence the jury, or other reasons may. The jury is not limited or circumscribed in any respect. It is in their discretion whether they will or will not recommend, and the law prescribes no rule for the exercise of that discretion. Penal Code, § 63; *Hill* v. *State,* 72 *Ga.* 131; *Thomas* v. *State,* 89 *Ga.* 480 [15 S. E. 537]. It is possible that there may be better words to use in this connection than to say that the reduction of the punishment is to be governed by the wishes of the jury in that regard. For ourselves, we think little, if anything, can be added to the words of the statute without qualifying it. Yet, after all, as the whole matter—the recommendation as well as the refusal to recommend—is in the power and discretion of the jury, and, when exercised, no tribunal can review or call in question the exercise of that discretion, it is a matter which the wishes of the jury must determine; and we can not hold it error to so charge."

In *Cohen* v. *State,* 116 *Ga.* 573 (42 S. E. 781), it was held: "The jury in the trial of one who is charged with murder, if they find the accused guilty, are invested by law with the power of fixing the punishment, by recommendation to life imprisonment. Whether they will so recommend or not is a matter solely in their discretion, which is not limited or confined in any case. Accordingly, where the jury were instructed that they had such right, full and un-trammelled, but in the same connection they were also instructed that the law allows such recommendation in cases where they think there are circumstances of mitigation, and in cases where the circumstances soften the crime, and where in their judgment they do not think the death penalty ought to be inflicted, a verdict of guilty without a recommendation must be set aside, because it is possible that the jury may not have fully understood the extent of their power as defined by the law." In the opinion it was said: "The Penal Code, § 63, declares that the punishment of persons convicted of murder shall be death, but may be confinement in the penitentiary for life, 'if the jury trying the case shall so recommend.' Whether the jury will recommend or not is for them alone to determine. They have a right, under this statute, to recommend that the offender shall be punished by confinement, without regard to the circumstances of the homicide. Whether they ought to recommend is another and distinct question, which appeals alone to them as jurors, and which they must decide without any suggestion from any other source than their own judgment. The power to recommend resting alone in the jury, and that power being confined by law to their discretion alone, any instruction, charge, or suggestion as to the causes for which they could or ought to recommend is error sufficient to set aside a verdict where no recommendation is made. In the case of *Hill* v. *State,* 72 *Ga.* 131, it was ruled that 'The code leaves it to the discretion of the jury as to whether they will recommend imprisonment for life in the penitentiary of a person convicted of murder; they are not limited or circumscribed in any respect whatever; nor does the law prescribe any rule by which the jury may or ought to exercise this discretion.' ' Such recommendation [is] in all cases matter of discretion with the jury.' *Thomas* v. *State,* 89 *Ga.* 479. 'This right [to recommend to mercy] is not restricted in the code to cases of mitigating circumstances, or other particular facts of any given case, but is at

the free disposal of the jury in any case,' etc.   *Johnson* v. *State* (a cattle-stealing case), 58 *Ga.* 491.   The solicitor-general insists that, in giving the instructions complained of, the trial judge unquestionably followed the reasoning of this court in the case of *Perry* v. *State,* 102 *Ga.* 365 [30 S. E. 903].   This is true.   The reasoning to which allusion is made was confined to a discussion, not of the power and right of a jury in such a case, but as to what ought to influence them in making a recommendation.   Indeed, in that case it was said, on page 379 in the opinion by Lumpkin, P. J., that 'This court has frequently decided that the judge can not properly undertake to give to the jury any rules to aid them in reaching a conclusion as to what they should do upon the question of punishment,' and the reasoning to which reference has been made was predicated on the proposition, which followed the above statement, that 'It by no means follows that the jury should capriciously exercise their power in this respect.'

"The attorney-general refers us to the case of *Taylor* v. *State,* 105 *Ga.* 781 [supra], as authority upon which perhaps the charges complained of may be sustained.   An examination of that case, however, will show that the ruling there made will not sustain the charge complained of here.   The investigation of the charge there was directed to instructions of the court in particular language to the effect that if the jury were satisfied beyond a reasonable doubt of the guilt of the defendant, and did not desire that he should suffer the death penalty, the form of their verdict would be, etc.; and 'If the jury find that the evidence establishes beyond a reasonable doubt that the defendant is guilty of the offense of murder, and do not desire to reduce his punishment to imprisonment in the penitentiary for life, but do desire that he should suffer the death penalty, the form of your verdict would be,' etc.   In our ruling on this charge we said:   'It is possible that there may be better words to use in this connection than to say that the reduction of the punishment is to be governed by the wishes of the jury in that regard. . .   Yet, after all, as the whole matter—the recommendation as well as the refusal to recommend—is in the power and discretion of the jury, and, when exercised, no tribunal can review or call in question the exercise of that discretion, it is a matter which the wishes of the jury must determine.'   It has not come to our attention that, under the provisions of our code giving to a jury the

power to recommend, this court has ever sustained a charge which either limited this power, or which, when fairly construed, might convey to the jury the idea that the power should not be exercised except in a particular class of cases. On the contrary, this court has frequently ruled that the jury must be left free in all cases to exercise that power, uninfluenced by any suggestion or direction of the judge. Understanding, as we do, that while the jury in the present case was instructed that the matter of recommendation rested alone with them, they were also told that the law allowed that recommendation in cases of a certain character, and in cases where in the judgment of the jury the death penalty should not be inflicted, we are constrained to rule, notwithstanding the evidence in this case clearly warranted the verdict of guilty, that from the charge taken as a whole the jury could have understood that the exercise of their power to recommend should be had only in a given class of cases. In reference to whether this ought or ought not to be the law we have nothing to say. But, as the statute, according to our interpretation, leaves the matter of recommendation entirely with the jury, and in their discretion alone, any instruction which tends to qualify this right, or to point out the manner of its exercise, is cause for setting aside a verdict where no recommendation has been made."

In the case under consideration all that was said in the charge on the subject is contained in the charge as to the form of the verdict, as follows: "If, upon a thorough consideration of the case and of all of the evidence and facts and circumstances as disclosed by the testimony, you should find the truth to be that the defendant has been shown to be guilty of murder, then the form of your verdict would be, 'We, the jury, find the defendant guilty;' and this verdict, without any further recommendation, would mean that the defendant would receive the death penalty. The jury would have a right to add to such a verdict, 'and we recommend the defendant to the mercy of the court;' in which event, his punishment would be imprisonment in the penitentiary for life." This is an instruction that the jury had an unqualified right, in case of conviction, to add to the verdict that the jury recommends the defendant "to the mercy of the court," and that if he should be so recommended the "punishment would be imprisonment in the penitentiary for life." This instruction does not restrict or limit

the power of the jury as to its right to make a recommendation, but submits that matter to them broadly and without qualification. On this view the charge comes within the ruling in the *Taylor* case, and differs from the charge involved in the *Cohen* case and does not fall within that ruling. Charges of similar import have been sustained in recent cases. *Bloodworth* v. *State,* 161 *Ga.* 332 (2) (131 S. E. 80) ; *Mars* v. *State,* 163 *Ga.* 43 (12) (135 S. E. 410). The instruction was authorized under the second paragraph of § 63 of the Penal Code, and was given in such concrete manner as that the jury was obliged to understand the effect of the recommendation which they were told they had a right to make. For reasons stated in subdivisions (d) to (h), inclusive, of the 10th ground of the motion for new trial, it might have been desirable, from the defendant's standpoint, for the judge to have charged more elaborately on the subject and to have charged more specifically in the language of the first paragraph of § 63. It was the right of the defendant, if he so desired, to have an instruction on that subject in the language of the statute; but the judge having correctly charged as indicated above, if the defendant desired further instructions, it was his duty to make an appropriate request. In the absence of an appropriate request the omission of the judge to give further instructions will not be cause for a reversal. In this connection see *Butt* v. *State,* 150 *Ga.* 302 (103 S. E. 466) ; *Tillman* v. *State,* 136 *Ga.* 59 (2) (70 S. E. 876). In the latter case the judge charged in the language of the first paragraph of § 63, and the jury returned a verdict finding the defendant guilty and recommending him to the mercy of the court. The verdict was sustained, this court holding, "there was no error in failing to charge the jury 'on the subject of the effect of a verdict of guilty with a recommendation to mercy.'"

■ The defendant made a statement in which he admitted facts which, under the law, would not justify him in killing Perry. The defendant was on trial for the murder of Perry under circumstances growing out of an admitted and proved conspiracy to rob the State Bank of Kingsland. The evidence and the defendant's statement show that he together with three others entered into a conspiracy to rob the Bank of Kingsland. In the view we take of this case, when this conspiracy was entered into it is not necessary that the crime of murder should have been a part of the original design to

rob the bank. It is sufficient if the crime of murder is one of the *incidental* and *probable consequences* of the execution of their design to rob the bank (*Gore* v. *State,* supra), and that it appeared to one of the participants in the conspiracy to be expedient or necessary for the common purpose of robbing the bank. In his statement to the jury the defendant admitted that it was the purpose of the conspirators, in order to rob the bank, to entice the cashier, Perry, away from his bank at Kingsland, and undertake to detain him, and to force from him the delivery of the combination to the vault of the bank to them; and in pursuance of such an undertaking the defendant and two others carried the cashier into the woods several miles from Kingsland, under the guise of purchasing a certain tract of land; and after they were unable to detain him longer than about dark, they undertook to force him to remain, at the point of pistols. The defendant went, according to his statement, to the car in which the deceased was, and asked him to get out of the car, saying that he wanted to talk with him; and while he does not say that he had a pistol in his hand at that time, he does say that he had his hand in his coat pocket, and that he fired almost immediately after the deceased got out of the car. The dying declaration of Perry was to the effect that the other conspirators were present with pistols ready for use. It appears from the evidence and the statement of the defendant that the conspirators provoked the difficulty and brought about a situation which justified Perry in defending himself against the illegal attack that was made upon him; and in these circumstances the defendant would not be justified in killing Perry against such a defense as Perry was forced to make in order to protect himself.

The defendant in his statement says that Perry had a knife and was undertaking to cut the defendant when he fired the shot which resulted in Perry's death. But it was the duty of the defendant, under the circumstances of this case, to have got out of the way of Perry even if he had a knife in his hand, as the defendant had brought about the situation, and there is no statement of the defendant, or contention on his part, that he endeavored to get away from Perry after he had provoked the difficulty. The evidence shows beyond controversy that the defendant and the conspirators who joined with him intended to rob the Bank of Kingsland, even if it was necessary to commit murder in order to accomplish their

purpose. The evidence shows that they were prepared to do whatever was necessary, not only to rob the bank, but to commit murder in order to rob it. They had in their possession, at the time, guns and pistols and other weapons used by burglars and robbers for the purpose of committing burglaries. So we are of the opinion that the defendant's statement nowhere shows any excuse for taking the life of Perry (*Jones* v. *State,* 130 *Ga.* 274 (4) supra); but on the contrary it shows an aggravated situation which the defendant had brought about himself, or helped to bring about. The defendant had admitted the general scheme and purpose of committing the robbery, and of the robbery itself; and under these circumstances, where, in order to accomplish their purpose of robbery, it was necessary to commit murder, and he did commit murder, then the murder is one of the *incidental probable consequences* of the execution of such a design to rob. He admitted the conspiracy to rob the bank, the shooting of Perry, and that he died from the wound. There is no legal justification shown for this unprovoked murder, which was the natural consequence of this scheme to rob. In his concluding statement to the jury the defendant said: "I wouldn't hardly tell the truth about one thing and lie about the other, because I'm too close to the end. I regret the whole thing of course now. I regret it for many reasons. I realize that I am the one that is suffering less than anybody. His people and our people are the people that are bearing the brunt of this thing, not us. Of course, we never realized that beforehand."

The evidence authorized the verdict.

*Judgment affirmed. All the Justices concur, except Russell, C. J., and Hines, J., dissenting.*

RUSSELL, C. J. It appears from subsection (e) of the 10th ground of the amended motion for new trial, as approved by the court, that the punishment to be inflicted by the jury was an acute issue in this case. From the nature of the evidence in the cause it may well be supposed to have been the paramount, and perhaps the only, issue before the jury. For this reason it was very important to the rights of the accused that the court should have clearly instructed the jury fully upon this point. As certified by the court, State's counsel "asked the jury not to show any mercy to this defendant, that he and his coconspirators had not shown mercy to Perry when they had him in the woods." In view of the

598

foregoing, I am of the opinion that the exceptions (f), (g), and (h) in the assignments of error in the 10th ground of the amended motion for new trial are well taken. A recommendation by the jury to the mercy of the court puts a greater burden on the defendant than that authorized or directed by law, since this court has uniformly held that it is not within the province of the court, even by remotest suggestion, to give any intimation to the jury as to what should be its proper course in the premises. I agree with what has been said by Mr. Justice Hines as to the necessity for giving in charge to the jury in every case of murder the substance of section 63 of the Penal code.

HINES, J. I dissent from the opinion of the majority as expressed in the 6th headnote and the corresponding division of the opinion. In a murder case the jury should be distinctly instructed that they have the full power to fix the punishment, and that they could do this by recommending confinement in the penitentiary for life. This right in no way depends upon an exercise of the quality of mercy. A mere instruction that they have the right to recommend the defendant to the mercy of the court is not the equivalent of an instruction that they have the full power to fix the punishmen by recommending his confinement in the penitentiary for life. The judge certainly should have given section 63 of the Penal Code in its entirety. He should have instructed the jury that they had full power to fix the punishment of the defendant, whether requested in writing to do so or not. In a case involving the life of the defendant I think the jury should have been specifically charged as above indicated.