26921. HANNA *et al. v.* ESTRIDGE.

DECIDED NOVEMBER 17, 1938. REHEARING DENIED DECEMBER 10, 1938.

*Titus & Dekle, H. H. Merry, Ira Carlisle,* for plaintiff in error. *Hay & Gainey,* contra.

FELTON, J. This case having been in this court before and being reported in *Estridge* v. *Hanna,* 54 *Ga. App.* 817 (189 S. E. 364), the allegations of the petition as set out in that report will not be repeated here, but for the purposes of this decision it will

be necessary to give in substance the amendments to the petition. They alleged that on stated dates and at stated places certain named persons had been mistreated by Hawthorne in the manner alleged in the original petition; that the said Hawthorne killed Estridge to protect the wild game on the Hanna place and on adjacent places, shooting from ambush in so doing, all of which was in keeping with his bloodthirsty character and the nature of his employment as aforesaid; that on or about January 4, 1934, Hawthorne, seeing Estridge on a deer hunt with one Wilder, threatened to kill Estridge and said, "I am going to get that fellow yet;" that the said conversation was had with the said Wilder, within sight but not within the hearing of Estridge, but that said threat was communicated by Wilder to Estridge on the day it was made; that in so far as plaintiff's petition relates to the employment and duties of Hawthorne, and in so far as it relates to the authority of Crosby over Hawthorne, reference to "the plantation of Hanna" is meant to include that body of land of about 20,000 acres, part of which is owned by H. M. Hanna, part by H. M. Hanna Jr., and other parts by his two sisters, Mrs. Harvey and Mrs. Haskell; that Hawthorne served the defendant for a period of about five years, and that for the year 1935 the duties and employment of Hawthorne, as such gamekeeper and special game warden, extended over the entire 20,000 acres, regardless of the ownership of the different parts thereof; that the supervision of Crosby over Hawthorne was territorially as broad as Hawthorne's duties and employment; that the entire compensation for Hawthorne's duties was paid by H. M. Hanna without contribution from anyone. The answers denied the material allegations of the petition and alleged that at the time of the homicide Hawthorne was a deputy game warden commissioned by the commissioner of game and fish. The jury rendered a verdict against all three defendants, and the exceptions are to the order denying a new trial.

The petition alleged that the employee, Hawthorne, killed the deceased husband of the plaintiff without justification. The answer of the defendants denied this allegation. There was no plea of justification filed. The burden of proof was upon the plaintiff to prove that Hawthorne committed the alleged homicide and that it was without justification. The plaintiff attempted to make out her case by proof of statements made by Hawthorne. Haw-

thorne admitted the killing but said that he was a deputy game warden; that he saw Estridge in possession of what he thought (and which the evidence shows was) a wild turkey, out of season; that Estridge was on a place adjoining Hanna's; that he called to Estridge to stop so that he could investigate the turkey and make an arrest if necessary; that Estridge refused to stop but ran into the woods; that he followed Estridge, continuing to ask him to stop; that Estridge would not stop and submit, but that he stopped several times and pointed his shotgun at him (Hawthorne), and threatened to kill him; that after Estridge pointed his gun the first time he pulled his pistol and followed him; that finally Estridge got behind a tree and shot him in the shoulder; that he ducked to dodge the shot; that Estridge whirled and was making an effort to reload his gun to shoot again, and that from the stooping position he shot Estridge four times with his pistol; that Estridge's gun jammed; that if he had not shot Estridge it would have been "final" for him. The above covers the extrajudicial statements made by Hawthorne and his testimony on the trial. His extrajudicial statements were not as full as his testimony, but they both show the fact of the killing and justification.

The evidence shows that the employee, Hawthorne, was deputized as an officer of the law by the commissioner of game and fish. He was acting in such capacity without pay at the time of the homicide. The law authorizes such an appointment. Code, § 45-124. As such he had a right to arrest a person violating the State game laws. The uncontradicted evidence shows that deceased had in his possession a wild turkey, the possession of which, out of season, was a violation of the law. Ga. Laws, 1931, pp. 178-9. The Code of 1933 omitted turkeys from section 45-308, and put the season for hunting them in § 45-310, but the mere omission from the Code is not a repeal of the law. *McCaffrey* v. *State,* 183 *Ga.* 827 (4) (189 S. E. 825). Since the possession of a wild turkey out of season is a crime, Hawthorne had a right to arrest Estridge upon seeing him violating the law, and Estridge was not justified in resisting the arrest. There is no evidence in the case which would authorize a jury to find that Hawthorne killed the deceased except his own statements outside of and in court. These statements admit the killing but claim justification. Such statements are not confessions or incriminating admissions, and *where the*

*killer is connected with the homicide by his statements alone a jury must accept the entire statement if it shows complete justification. Miller v. State,* 184 *Ga.* 336 (191 S. E. 115), and cit. The statements·of Hawthorne show complete justification for the killing. He stated that he saw Estridge with what he thought was, and what was shown to be, a wild turkey, out of season (and whether it was on or off the place is immaterial) ; that he called to him to stop without avail; that Estridge stopped several times, pointed his gun at Hawthorne, and threatened to kill him; that he continued to follow Estridge, calling on him to stop, until finally Estridge got behind a tree and shot him in the shoulder with a shotgun, and wheeled around in an effort to reload his gun and shoot again, whereupon Hawthorne shot him with his pistol and killed him.

The only fact testified to in the case which is not in harmony with Hawthorne's statements is the testimony of fourteen-year-old Mary Spearman. Hawthorne stated that when Estridge shot him with the shotgun he ducked and was shot in the shoulder. The evidence showed that he was shot in the shoulder. He stated that after Estridge shot him the first time, he wheeled around in an effort to reload the shotgun and that it got jammed. The evidence showed that Estridge's gun had a shell stuck in it which caused it to jam. Hawthorne stated that while he was stooped over he .shot Estridge, and the evidence developed that he shot from a position lower than that of Estridge. Mary Spearman testified that she heard five shots on the afternoon of the homicide, about the time it is said to have occurred, and that the shotgun shot last and the pistol shot first. If her evidence were sufficient to identify the five shots with those involved here it would not make out a case, because the only way any one knows that Hawthorne was connected with the killing is by his own statements, and these statements show justification. The plaintiff can not make out a case on a self-serving declaration by attacking the same as false without additional evidence connecting the defendant with the killing or showing lack of justification, the burden of showing which was on the plaintiff. In standing up a straw man and knocking it down there is nothing more present than there was to begin with, and the evidence outside the statements not remotely connecting Hawthorne with the killing, or showing lack of justifi-

cation (because Hawthorne could have been justified even if he had shot first), the verdict in this case is not supported by the evidence.

There is a great deal of evidence in the case which might give rise to various conjectures and speculations from the viewpoints of both the plaintiff and the defendant, but which do not in themselves form the basis for any specific finding of definite conclusions. The coroner's jury acquitted Hawthorne and the grand jury returned a no bill. That part of Dr. Palmer's testimony with reference to the injury to the arm of Hawthorne might indicate that Hawthorne could not have fired his pistol after being wounded in the right shoulder. However, Dr. Palmer prefaced his testimony with the statement that he could not say what the probable effect on the use of his arm the injury would have, and that a great deal would depend on the extent of the injury. On the other hand Dr. Cheshire testified that in his opinion the injury to the shoulder would not affect the use of the arm, and that when he attended Hawthorne several hours after he was shot he could use his right arm. Whatever may be the truth of the matter we are confronted with the question as to which is the more unreasonable, that Hawthorne could fire a pistol after his shoulder had been wounded, or that Estridge could fire a shotgun after he had received three mortal wounds from a pistol. Neither does Hawthorne's statement that he would "get" Estridge throw any more light on the case than Estridge's statement that Hawthorne was going to keep on "messing" with him until he got his head shot off.

The evidence that Hawthorne was accustomed to pulling his pistol whenever he approached any one he thought was poaching or killing game out of season is entirely without probative value to show lack of justification in the absence of anything to support it. Even if it could be said that in a civil case there was a presumption of lack of justification from the use of a deadly weapon, it would not apply in this case because, as we have stated, the fact that Hawthorne did the killing comes from him, together with the explanation showing justification, and the physical facts themselves leave us in complete darkness as to whether the killing was justified or not, even if we grant that Hawthorne shot first.

Of the several witnesses who testified that they heard the shots there was only one who undertook to swear positively that the shotgun of Estridge shot last. The testimony is that all of the shots

were fired in rapid succession. Assuming for the sake of argument that the shotgun was fired last, this does not disprove the uncontradicted testimony of Hawthorne to the effect that he shot in self-defense, and especially is this true where the facts in this case do not show a lack of justification but are consistent therewith. *Georgia Railway & Electric Co.* v. *Harris,* 1 *Ga. App.* 714 (57 S. E. 1076).

The verdict was not authorized by the evidence and the court erred in overruling the motion for new trial.

*Judgment reversed. Sutton, J., concurs. Stephens, P. J., dissents.*

STEPHENS, P. J., dissenting. I can not concur in the opinion and the judgment of reversal in this case.

Dr. J. I. Palmer testified for the plaintiff that Hawthorne, the person who is charged with killing the plaintiff's husband, and who it is claimed fired the first shots, testified as to the wound on Hawthorne: "I could not say what the probable effect of the use of it [Hawthorne's arm and shoulder] immediately after receiving the gun-shot wound in the shoulder would be on the top of it. A great deal would depend on the extent of the injury. It would be my opinion that the arm would be paralyzed, at least for a few minutes, from any blow such as to bloody him all up and send him to the hospital. I should think that would be the immediate result of receiving such a shock. Any wound in the shoulder sufficient to tear out any muscle would paralyze a man's arm." In these circumstances, could Hawthorne have fired his pistol after such wound?

There was evidence of several witnesses, and the undisputed facts show, that the dead man was on the plantation of Pat Ward at the time he was killed, and was not on the land of the defendant Hanna. The witness Mary Spearman testified that she knew Hawthorne and knew the dead man, Estridge; that she heard five shots fired; that four of the shots were quicker than the one loud shot, and that the loud shot went louder than the others and that the others came first, the last one roared more than the others. Her mother testified: "I think I heard four shots. One was real different from the others, the shotgun I think it sounded last. And the others were just as fast as the trigger could be pulled. I was so badly frightened that I didn't know whether the shots were gun

shots or pistol shots; and I didn't know which came first, they came along pretty close together; I would not be willing to swear which shot first, because I don't know, it scared me so much."

There was also evidence that Hawthorne was accustomed to pulling his pistol whenever he approached any one whom he thought had been poaching game, or who had been killing game out of season. W. L. Wilder testified that one day when he was on a deer hunt Hawthorne came up to him and asked if the deceased was with him, and when the witness replied "No," Hawthorne stated, " 'I am going to get that fellow yet,' and he used some curse words when he said that." Dr. Cheshire testified for the defendants that the wound that Hawthorne received from the shotgun witness thought would have knocked him down if he was standing up. Henry Whiddon testified that Hawthorne's arm, after receiving the wound, was useless and he could not use it. From the testimony of B. F. Newton, who, it appears, had been a game warden on the Hanna place, this appears: "I heard four shots in all, three of the pistol and one of the shotgun. . . There were five shots with the turkey shot. . . The pistol shots were fired as quickly as he could pull the trigger." This same witness further testified: "I remember three pistol shots fired . . the shotgun was after all the pistol shots, but it sounded like the shotgun fired first, but it was all just as near together as you could imagine. There were three pistol shots and one gun shot. I asked some colored people down on the place which they thought shot first, because I could not be real positive. My reason for asking them was that I had often seen them making their rounds, and when I said I believed the shotgun fired first they said they thought I was wrong."

Conceding that when the fact of a homicide can only be established by the statement of the killer his statement justifying the homicide must also be taken, it is nevertheless true that where there are circumstances from which it can be inferred that the homicide was not justified, the killer's statement as to the fact of the homicide may be taken and his statement as to justification may be rejected. See *Cook* v. *State,* 114 *Ga.* 523 (40 S. E. 703). It is inferable from the circumstances in evidence that Hawthorne's justification of the killing on the ground that the deceased shot at him first is not true. It is inferable from the testimony that

Hawthorne shot first, and that the gun which was fired by the deceased followed Hawthorne's shot. While the witnesses from whose testimony such inference may be drawn, who testified on direct examination as to the sequence of the shots, putting the pistol shots by Hawthorne as having preceded the gun shot by the deceased, weakened their testimony on cross-examination, stating that they were uncertain as to the sequence of the shots, the jury was nevertheless authorized to accept any portion of the witnesses' testimony and reject other portions as they saw fit. *Sappington* v. *Bell*, 115 *Ga.* 856 (42 S. E. 233). Besides, there is evidence that Hawthorne stated his intention "to get" the deceased, evidently meaning that he intended to shoot or kill him. It was a question for the jury as to what Hawthorne meant by this statement. This statement was in its nature hostile to the deceased, and it was inferable that Hawthorne meant by it to do some harm to the deceased. Therefore, as I view the case, it does not appear conclusively without dispute from the testimony that Hawthorne shot the deceased in self-defense, but that it is inferable that he shot him unjustifiably, and that in so doing he was acting within the scope of his authority as a servant or agent of the co-defendant, Hanna.

It is my opinion that the evidence supported the verdict for the plaintiff. I therefore dissent from the judgment of reversal which is based upon the ground that the evidence did not support the verdict.