VALENTINE vs. THE STATE OF GEORGIA.

1. The verdict of guilty in this case was supported by the evidence.
2. Where a bill of exceptions assigns error on the overruling of a
motion for a new trial on the grounds therein set forth, such
grounds should be complete in themselves.   Where grounds of a
motion for a new trial allege error, in that the court admitted testi-
mony of certain named witnesses as to the confessions of the de-
fendant, made in the presence of such witnesses, "as disclosed in the
brief of evidence in the record of this case, to which leave of refer-
ence is prayed, on the ground that said alleged confession was

not freely and voluntarily made, as appears by the testimony of said (witnesses) touching said alleged confession," but did not set out the testimony excepted to, or what transpired before the court as to its admission, the assignment of error is incomplete and not properly before this court.

(*a.*) What transpired before the court, on the question of admitting confessions in the absence of the jury, formed no part of the brief of evidence admitted before the jury, and was not, therefore, properly a part of the record.

3. If the assignment of error were sufficient, the admission of the evidence would not require a new trial. Although something was said to the defendant at one time, to the effect that he had been a good worker and that his employer wished to help him, and afterwards that it might be better for him to tell his employer about it, yet he was left perfectly free from either hope or fear in saying what he did; and although afterwards something was said, to the effect that he had better tell the truth in Augusta, where he then was, as witnesses might be brought from Virginia to tell what he had said there, but that if he said anything to tell the truth anyway,—these facts did not require the exclusion of his statements from evidence.

(*a.*) Moreover, other inconsistent confessions were made, convicting him of the murder, but wholly unlike any he had previously made, and which could not have at all resulted from those above considered.

4. The fact that, in charging the jury as to their right to recommend confinement in the penitentiary for life in case of a conviction for murder, the court said, " Then, if you convict him, it is for you to say whether the facts of the case, whether all the circumstances, warrant you in recommending him to the mercy of the court," will not require a new trial. Such language did not circumscribe or restrict the jury in respect to the exercise of their right of recommendation.

(*a.*) This case differs from those of *Hill vs. State,* 72 *Ga.* 131, and *Johnson vs. State,* 58 *Id.* 491.

5. Where the jury, after having been out several hours, returned into court and stated that their failure to agree arose out of the question of recommendation, and that they desired to know whether, in the event they failed to recommend to mercy, the judge had any discretion in fixing the punishment, there was no error on the part of the judge in replying, "The question is entirely for you, gentlemen of the jury. If you find the defendant guilty, the law leaves no alternative to the court but to sentence him to death. It is for you to say from the evidence, from all the facts and circumstances of the case, whether, in the event you find him guilty, you are warranted in recommending him to imprisonment in the

penitentiary for life; and if you render a verdict with that recom mendation, the court is bound to sentence him accordingly."

November 23, 1886.

Criminal Law. Evidence. Practice in Supreme Court. Charge of Court. Before Judge RONEY. Richmond Superior Court. April Term, 1886.

Preston Valentine was indicted for the murder of William Vail, and on his trial was found guilty. The facts are sufficiently stated in the decision, and it is necessary to add only that the testimony of the two witnesses detailing the confessions, which were objected to but admitted in evidence, was as follows:

*L. G. Byers, sworn for the State.*—I reside in Alleghany, Virginia, and am sheriff of that county. I recognize the defendant, and first saw him last January, at Lowmore, Alleghany county, Virginia. He was at work at Lowmore Junction, at the coke oven. I was present last month at the time of his arrest for this crime. The arrest was made at Lowmore by Mr. Clark and myself. Mr. Clark is the commissioner of revenue of that county. We arrested him near his boarding-house at the junction, just off from the coke ovens a few hundred yards. We carried him over to the depot into the office of Mr. Williams, the depot agent. Mr. Williams was present, Mr. Purcell, the operator, and several others. Defendant was at the office of the depot when he made certain statements to me and other parties present. The name of the superintendent of the mines was A. Skelding. Mr. Skelding came into the office just about the time we took Valentine in there. He made a statement or confession in my presence, and in the presence of those gentlemen. (The jury were retired at this point beyond the hearing of the testimony.) No threat was made or reward offered. Mr. Skelding remarked to him, " Tom, how comes it that you have got into this trouble; you have been a good hand with me? How came you to get into this trouble?" Tom said, " Boss, I'll tell

you all about it. There were two or three white men that sent for him to come to the street car stables, and after he went there, they made him kill Mr. Vail—made him knock him in the head with an ax." At that point, Mr. Purcell spoke up and said, " Wasn't it a pick ?" He said, " No, it was an ax." He then said that one of the men poured kerosene oil on Mr. Vail and set it on fire, and broke the drawer open and took a lot of nickels, and told him to go out and get them changed for other money. He stated that it was $27 or $37; I forget which. All that was said before Mr. Purcell or anybody else had said a word to him in reference to the matter. Mr. Purcell had had no interview with him. Neither Mr. Skelding nor any one else had offered him any reward or made any promise or threat to him at the time.

*Preliminary cross-examination.*—I arrested Preston Valentine by request of Mr. Purcell. When I reached Lowmore, I and Mr. Clark went to the office of the company and learned of Mr. Collier, the clerk of the Lowmore Iron Company, that Thomas Jones was still with the company—that he had been on duty that morning. We then started to the coke oven. Mr. Clark and Collier went with us. Mr. Purcell was then in the depot. When we got to the coke oven, we asked the boss if Thomas Jones was there. He told us no, that he was round to the boarding-house. We started round and met Thomas Jones on the way and arrested him. When we had walked fifty yards, he said, " What's the matter, boss; what have I done ?" Mr. Clark said, " There is a gentleman at the depot who wants to see you." When we reached the depot, there were present, besides myself, Mr. Williams, Purcell, Clark, Collier, the operator and Mr. Skelding. Mr. Skelding asked Tom how he got into this trouble. His reply was, " Boss, I'll tell you all about it." He seemed to recognize Captain Purcell, and said good morning. Mr. Skelding remarked to Tom that he had been a good hand; asked him how he had got into this trouble; and said if

there is anything that I can do for you, I will do it. Mr. Purcell did pawn his watch with me. He told me he would give me fifty dollars to help him hunt this man up. He told me he didn't have the money. He was a stranger to me, and he just handed me his watch—pawned it with me.

Counsel of defendant objected to the testimony of the witness, on the ground that the confessions were not freely and voluntarily made without hope or fear to induce them. The court overruled the objections, and decided that the testimony as to the confessions might go to the jury.

The jury having returned to the box, the testimony of witness proceeded in the hearing of the jury, witness stating substantially what he had already detailed in the presence of the court, with these additional facts:

Mr. Purcell held no conversation with the prisoner that was not in my presence up to the time of the confession. His statement to Mr. Skelding, both as to the amount and character of the money stolen, and as to the crime and details of it, was made before I had communicated to him any of the facts.

*Cross-examined.*—The substance of the language used by Mr. Skelding was about this: " Tom, you have been a good boy. Tell me all about it, and I will do all I can for you," or, " if there is anything I can do for you, I will do it," and then what was said by defendant followed. I am here in this case because I was telegraphed for. I have received no subpœna. Mr. Purcell telegraphed me that the solicitor-general wanted me, and I voluntarily came on that telegram. I am not at all interested in the matter pecuniarily. Mr. Purcell did offer me fifty dollars to assist in the arresting of this man. That was of no interest in this case. Purcell has not given me the money yet. He said he didn't have it. I still hold the watch as collateral. I paid my own way here, but expect the State to replace it. I received a telegram from the solicitor to that effect.

*E. B. Hook, sworn for the State.*—Since the arrest of the

prisoner and since he has been in jail, I had an interview with him.

Counsel for defendant here made the same objection to the testimony of the witness, as to the confessions made by defendant, as had previously been made in the case of the preceding witness, to-wit: That if the first confession was not admissible because not freely and voluntarily made, any subsequent confession of the same character, whether freely or voluntarily made or not, was not admissible. The jury was retired beyond hearing, and a lengthy preliminary examination of the witness was had, the substance of which was as follows:

The day after the prisoner arrived in Augusta, Mr. Sanford Cohen, Captain Purcell and I, together, visited him at his cell. He was told by all of us that he was not compelled to make any statement at all if he did not desire to; that under no circumstances did we wish him to say anything that was not true.

There was no threat of any sort used. He then entered on his story and in one or two little instances he would seem to vary from the statement he had made in beginning, according to Mr. Purcell's understanding, and he would say, "Now, Preston, is that the way you told it up there? Those gentlemen that heard you in Virginia will be here on the trial. If you don't tell it like you did there, they will be here to say so." I remarked to Preston, it did not make any difference about the way he told it in Virginia. I said, "If you lied in Virginia, we don't want you to lie again now. If you told the truth in Virginia, we want you to tell it now." Nothing was said about its being better for him to confess or tell all about it. No hope or reward or threat or fear was held out to him, that I know of.

*Preliminary cross-examination.*—Before any statement was made about what occurred, I stated it would be better for him to tell the truth about it. The language used was, that it would be better for him to tell the truth if he was going to tell anything.

*Preliminary re-direct examination.*—I could not say exactly that the word better was used at the time. I had no idea of being brought here as a witness. I only took the statement at the time to publish it. Notes were taken and afterwards written out.

*Re-cross (preliminary).*—The sense of my remark was, that he need not state anything if he did not wish to do so—that it was not compulsory; and in the same connection followed my remark, that he had better tell the truth if he told anything at all. I don't know that I used those words. I can state that not the slightest hope of benefit or the remotest fear of injury was held out to him on the occasion.

Counsel for defendant objected to the testimony, because it was not freely and voluntarily made without the slightest hope of reward or the remotest fear of punishment. The court overruled the objection, and the jury returned to the court-room, and the facts hereinbefore stated by the witness were substantially repeated in the hearing of the jury, with the following additions:

Prisoner stated that Mr. Kent told him to meet him about dark that evening at some point near Clark's flour mill; that he wanted to see him; that he met Mr. Kent, and that they walked from there down to the bridge, between that point and the street car stables, where they met two other men. One of them had his face blacked. I don't remember who he said those men were. They told him they had some work they wanted him to do that night. They had gone on down into the yard next to the street car stable's lot; there he was told he was to kill old man Vail. He protested against it; they had told him he had it to do. He had a drawn pistol at his head, and was told, if he didn't kill Vail, there would be no more of him. They went from the yard adjoining the lot into the shed to car number seventeen in the rear of the lot, and sat there until Mr. Vail came out of his office to make his rounds in the lot. When he got behind the stable, they

went up to the office that he had just left and ranged themselves just inside the door, standing with their backs to the wall so that he should pass them when he came in. Prisoner was next to the door, Mr. Kent next to him with a drawn pistol at his head, and the other two men beyond Mr. Kent; as they heard the old man coming, Mr. Kent said to him, "Now you hit him when he comes in, or there's no more of you." He said, "I did not want to kill him, but it was either kill him or be killed myself, and as he came in the door, I struck him in the head; he fell and I leaned against the wall at the shock of the thing." Then he said that Mr. Kent went into the stable and got a pick; that the killing was done with a common ax for cutting wood; that he was not killed with the pick at all, but was struck in the head with an ax; that Mr. Kent went out to get the pick to open the drawer; that in the meantime, one of those other men poured kerosene over the body of Mr. Vail; and that as Mr. Kent was going to open the drawer, he said, "Why don't you unlock it; you have got the key;" but he replied that it ought to be broken open to show that somebody had broken it open. He gave him a certain amount of money that he was to change for bills and bring back at a subsequent interview. They set fire to the body of Mr. Vail, after having poured kerosene on it, and dispersed.

I can't detail the route he said he took after he left Augusta, except as it was published, etc.

The defendant made a motion for a new trial on the grounds stated in the decision, which was overruled, and he excepted.

TWIGGS & VERDERY; E. T. WILLIAMS, for plaintiff in error.

CLIFFORD ANDERSON, attorney-general, by brief; BOYKIN WRIGHT, solicitor-general, for the State.

JACKSON, Chief Justice.

1. This evidence is abundant to support the verdict of guilty.    It seems to us to demand it, and to demand it without those confessions which are in the slightest degree doubtful of admissibility.

Vail was murdered in a room belonging to the street car stables in Augusta, where he kept the money for delivery the next morning for change to the drivers.    He was murdered at night.    Defendant, not then employed by the company, but having been discharged a short time before, came next day to the scene where the murder was committed, and being looked at suspiciously, jumped upon a dray moving off and was gone.    A policeman got after him while on the dray, and he jumped off and escaped to Virginia, where he was arrested and brought back to Georgia.    Before he left Augusta, he exchanged a very large number of nickels and small pieces of silver, just such as deceased would have had in the drawer of which he had charge.    He gave as a reason for having so much little money—some eight or ten dollars or more in nickels—at the time he made the exchange for bills with some of the stores, that he peddled chickens.    His statement on trial was, that a man from South Carolina got him to change the nickels for the bills, because he, defendant, knew Augusta so well.    In statements to others, he said white men made him kill deceased, and gave him the money taken from the drawer to be exchanged.    The false statements, the possession of the money, the jumping hurriedly on the dray when suspected, the jumping off when the policeman was after him, the running off to Virginia—away off from his home in Augusta—point to him, irresistibly carrying conviction of his guilt, beyond any reasonable hypothesis that the evidence could establish or probably suggest, that somebody else committed the terrible crime.    Vail was knocked in the head, kerosene poured over the corpse so as to burn him black, doubtless with the intention to burn

up the premises and escape detection, and off to Virginia this defendant made his escape, while everybody else remained quietly at home.

2. The third and fourth grounds of the motion allege the illegal admission of confessions in the words following:

(3.) Because the court erred in admitting, over the objections of defendant's counsel, the testimony of S. G. Byers, a witness for the State, as to a confession of the defendant, made in his presence, as disclosed in the brief of evidence in the record of this case, to which leave of reference is prayed, on the ground that said alleged confession was not freely and voluntarily made, as appears by the testimony of said Byers touching said alleged confession.

(4.) Because the court erred in admitting, over the objections of defendant's counsel, the testimony of E. B. Hook, a witness for the State, as to a confession made by the defendant in his, the said Hook's, presence, while confined in jail, as disclosed in the brief of evidence in the record of this case, to which leave of reference is prayed, on the ground that said alleged confession was not freely and voluntarily made, as appears by the testimony of said Hook touching said alleged confession.

The assignment of error in the bill of exceptions is, that the court erred in refusing the new trial on the several grounds of the motion for a new trial. It is a good assignment of error if the ground of the motion be complete in itself; it is not, unless it be so complete in itself. These grounds are not complete in themselves, but to see what the confessions were and what evidence went wrongfully to the jury, and thus whether the defendant was hurt or not by the admission of it over objections of counsel, it is necessary to inspect the brief of evidence. The 4251st section of the code demands that the decision complained of shall be plainly specified in the bill of exceptions; that is to say, the ground of exception and assignment of error must of itself show what is the error complained of. If these grounds of the motion had set out the facts rejected

and the facts that transpired before the court, then the assignment of error would be good, for it assigns error on that ground of the motion, and this need not go out of the motion approved by the court below to ascertain the error complained of; but even to call, to aid the motion and assignment, the brief of evidence before the jury would be insufficient; to invoke, however, as in this case is done, what transpired before the court on the question of admitting the confessions to the jury, and in their absence, is no part of the brief of evidence, and therefore no part of the record, and therefore evidence of nothing. It is a brief of evidence before the jury that the statute allows to come before this court as part of the record; it is not conversation between the court and counsel, nor is it what witnesses said before the court for his own separate action, and not for the jury even to hear.

3. But even were we allowed by the master of us all—the law—to hunt up what is scattered in the brief of evidence to find a specification there which ought to be in the motion for a new trial, and the error assigned on it; or worse, if the law allowed us to consider testimony before the court alone, and conversation about it between court and counsel, improperly and unlawfully interjected in the brief of evidence, we should encounter nothing authorizing us to disturb the verdict. There is no pretence of threat in any of the statements of witnesses to the prisoner, nor is there hope of reward. Something was said to him by the Virginia employer, to the effect that he had been a good worker, and he wished to help him, and afterwards that it might be better for him to tell him about it, but he was left perfectly free of either hope or fear in saying what he did, and afterwards, in Augusta, something was said to the effect that he had better tell the truth there, as witnesses from Virginia might be brought to tell what he had said there, but, if he said anything, to tell the truth anyway; and all this was enough to let the jury have it before them, and not absolutely exclude it.

Moreover, other inconsistent confessions were made con-victing him of the murder, but wholly unlike any he had made before, and which could not have been at all conse-quential on the two above considered. It is enough, how-ever, that no legal assignment of error is before us.

4. The fifth and sixth grounds are in reference to the charge of the court on the right of punishment by the jury of the defendant, uncontrolled by the court, and are as follows:

(5.) Because the court erred in charging the jury as fol-lows: "The punishment of murder shall be death, but may be confinement in the penitentiary for life in the fol-lowing cases:" (Here the court read §4323 of the revised code), and added, "So you see that in all cases of murder, convictions of murder, whether the verdict is based upon circumstantial testimony or not, the jury may recommend the prisoner to the mercy of the court, and if you recom-mend him to the mercy of court, this court is obliged to re-spect that recommendation, and the punishment will then be, instead of death, confinement in the penitentiary for life. It is for you to say first whether the testimony satisfies you, beyond a reasonable doubt, as to the guilt of the defendant; if it does, it is your duty to convict. Then if you convict him, it is for you to say whether the facts of this case, whether all the circumstances, warrant you in recommend-ing him to the mercy of the court."—Defendant claiming that by the use of said language the court limited the jury, in the exercise of their right to recommend, by the facts and circumstances of the case; that the use of said lan-guage was equivalent to charging the jury that their right to recommend depended upon the facts and circumstances of the case, whereas, under the law, the right to recom-mend in any case is merely an arbitrary right and privilege of the jury, without regard to the facts and circumstances.

(6.) Because the court erred as follows: After the jury had been out in their room several hours without being able to agree, they were brought into court, and the court,

v 77-31

on being informed that they had not agreed and wished to be further instructed, asked them what the difficulty was.   One of the jurors replied that it was the question of recommendation, and that the jury desired to know whether, in the event they, the jury, failed to recommend to mercy, the judge had any discretion himself in fixing the punishment.   To which inquiry the judge replied as follows: "That question is entirely with you, gentlemen of the jury.   If you find the defendant guilty, the law leaves no alternative to the court but to sentence him to death.   It is for you to say from the evidence, from all the facts and circumstances of the case, whether, in the event you find him guilty, you are warranted in recommending him to imprisonment in the penitentiary for life; and if you render a verdict with that recommendation, the court is bound to sentence him accordingly."—The error complained of being, in the opinion of defendant, that the language used in the supplementary charge again limited the jury in their right to recommend by the facts and circumstances of this case, and that there was a repetition of the error assigned in the fifth and foregoing assignments of error.

We think that the error herein assigned on these two grounds of the motion amounts to nothing, because the issue of law made is settled by the case of *Inman vs. The State*, 72 *Ga.* 269.   That case covers this.   The distinction taken there between that case and *Hill vs. The State*, 72 *Ga.* 131, also exists here.   The case of *Johnson vs. The State*, 58 *Ga.* 491, relied on so strongly by the able counsel for plaintiff in error, is for the offence of cattle stealing, and arose under a different statute in respect to the power of the jury on the subject of punishment.   Moreover the charge in that case confined the right of the jury in this, that the court charged that if there were no circumstances to justify you in recommending him to the mercy of the court, "why then you ought not to do it."   Such a charge as that would be error under the statute in respect to pun-

ishment for murder, because it said to the jury that they ought not to recommend to mercy unless such and such was proved.

5. That the charge was substantially repeated when the jury came into court and stated that their trouble to agree arose out of that difficulty in regard to the respective powers of themselves and the court, cannot be error.    The court told them it had none, but the jury had all; "it is for you to say, from the evidence, from all the facts and circumstances of the case, in the event you find him guilty, whether you are warranted in recommending him to imprisonment in the penitentiary for life, and if you render a verdict with that recommendation, the court is bound to sentence him accordingly."

This is what he should have instructed them when they asked him about that trouble on their minds.    The responsibility was upon them, and they should have known it.

Judgment affirmed.