## MEYERS *v.* THE STATE.

No. 7007. NOVEMBER 13, 1929. REHEARING DENIED DECEMBER 16, 1929.

*Pierce Brothers,* for plaintiff in error.

*George M. Napier, attorney-general, George Hains, solicitor-general, T. R. Gress, assistant attorney-general,* and *John M. Graham,* contra.

HILL, J. The grand jury of Richmond County returned a true bill against Arthur Meyers, charging that on April 1, 1924, he did kill and murder R. F. Gunn by shooting him in the body with a pistol. On the trial the jury returned a verdict of guilty, without recommendation, and Meyers was sentenced to be hanged. His motion for a new trial being overruled the defendant excepted.

■ The evidence was sufficient to authorize the verdict. The defendant offered no evidence, but made a statement, the substance of which will be set out later. E. D. Devaney, a witness on behalf of the State, testified in part as follows: "At the time Mr. Gunn was killed at Steedley's crossing in this State and county, around April 1, 1924, I was a switchman for the Georgia Railroad. I saw Mr. Gunn that day. It was around 6 o'clock that the shooting of R. F. Gunn took place. I recall the incident of a negro getting on the train, but Mr. Gunn was not by him at the time. I saw him on the front board of the engine, between the engine and the cars. The negro got on the train right by the side of Mr. Gunn on the foot-board between the engine and the cars; we were backing up. He got on right at Steedley's crossing. Approaching Steedley's crossing I saw Mr. Gunn on the front foot-board of the engine. He was on the opposite side of the engine at that time, and approaching Steedley's crossing he stepped over the knuckle to the opposite side, and I know what his business was on there—to catch those fellows for riding trains,—and I stepped over to the other side of the engine too, and about the time I got there we were at Steedley's crossing, and this negro stepped up on the foot-board. The train was moving. Mr. Gunn took hold of him. The engine had got nearly to Steedley's crossing at the time, and I told the engineer he had better stop and put him off—he might get hurt in getting down; and he stopped. He stopped about half way between Holley Street and Steedley's crossing. He stepped down off the engine with him and caught hold of him and started back to Steedley's crossing, walking down the track. We had started off then, but I was still watching and I saw the negro feeling in the back of his coat, like that, fumbling for something, and I made the remark to Mr. Pender that we had better stop and go

back down there—the negro would get in trouble. We did not stop at that time, but I looked back and saw the negro at Steedley's crossing, and we stopped and went back, and I saw Mr. Gunn in the crowd at Luckey's store, and I told the crowd to stand back and give him air. When Mr. Gunn got off the train he had hold of the negro. He had hold of his coat; I don't know whether his lapel or what part of the coat; but he had hold of his coat on the left side, and in that way they alighted off the train. They went down the track towards the crossing in the same manner, with the negro on the left of Mr. Gunn. At that time Mr. Gunn still had hold of him; he had hold of his coat; .I saw that myself. At no time between the time he got off the train and going towards the crossing did I see Mr. Gunn in front or behind the negro; he was right on his side, as I have just described. Other than that, there was not anything that I observed between the negro and Mr. Gunn. I did not at any time see any disturbance between the two. I did not see any violence on the part of Mr. Gunn to him; he never touched him nowhere; only had his left hand on his coat. I did not hear a shot; the engine was going after he got off the train." On cross-examination this witness testified: "As to whether or not he was concealed, would say he was not in open full view, but from his waist up; couldn't see his legs a bit. When he stepped up he was in full view. Yes, the defendant saw Mr. Gunn when he did step on. Mr. Gunn was in full view, but had no uniform or anything to indicate he was an officer or anything. I did not see his badge."

S. A. Pender, the engineer referred to above, testified substantially to the same effect as the switchman. He further testified: "I watched them until they got to the corner and went around the chicken-coop at Mr. Joyner's store, and as I watched them Mr. Gunn was the least bit in the front of the negro and holding the negro. I did not see them stop at all. I did not see them have any altercation at all—no kicking or anything like that. The negro put his right hand in his hip-pocket and took it out, and then put his left hand on his hip-pocket, and then put it in the front pocket; and that is all I saw. I heard the shot. I did not do anything. I saw the crowd gather up there. I stayed on the engine. I recall the negro that got on the train. That is the negro that got on the train; that is him sitting over there. At the time that Mr. Gunn got off the train with Arthur Meyers, this negro, and walked back

the distance I described, he did not have anything at all in his hand. He did not pull a gun or any weapon. If he did, he pulled it after he turned the corner. His position with the road was special agent. I did not see his badge of authority he had, or any policeman's badge."

S. R. Young, a witness for the State, testified as follows: "I was present up at Steedley's crossing when Mr. Gunn got off. I was crossing the street in an automobile at the time. I was crossing the street just as the switch-engine got clear of the crossing and I passed, and I heard the pistol shoot and it attracted my attention, and I looked and saw Mr. Gunn fall; and I told the gentleman I was with to stop, a man had got shot. He said, 'How do you know?' I said, 'I saw the man fall, and I saw the negro run off.' I went over there, and he was on the sidewalk as pale as a corpse, and I lifted up his shoulders. I said to some gentleman, 'Lets put him over here by the store;' and another man helped me. By that time some other men came to help him, and we got in the car. I saw the man's hand go up and saw him fall, and then I told the man I was with to stop, and I got out of the automobile. It did not take but a few minutes to get over where I was to where the man had fallen; it was right across the railroad. Mr. Gunn did not have a thing in the world in his hand when I got there; he was up on his elbows this way. I did not see anything on the ground, and I did not see any pistol or weapon about him. I was on Railroad Avenue, and I immediately went over there as soon as I got out of the car."

Dr. A. W. Davis, for the State, testified: "I examined Mr. Gunn's body at his father's residence in Warrenton, Georgia. I was called by the deceased's father and Mr. T. L. Anderson, his father-in-law, to remove the bullet that was in his body. I went to his residence and had him just taken from the casket and placed on a table, and I got a steel bullet from about the level of the seventh or eighth rib on the left-hand side, about three and a half or four inches from the spinal column on the left side, about three quarters of an inch beneath the skin. I cut the bullet out and sutured the place over. I couldn't say whether that is the bullet or not; it looks like the bullet I cut out. It was a steel-jacket bullet. I don't know what caliber that is—looks like a 32. My idea from an examination is that the bullet took an upward

direction, traversing the spinal column and breaking the spinal column. The effect of breaking the spinal column at the point of Mr. Gunn's body below that point would cause a paralysis below the wound. A person with such a wound in his body, he would fall instantly after having been shot like that."

John J. Evans, for the State, testified: "I saw the plain-clothes man coming with a negro from Railroad Avenue this way [indicating], and the plain-clothes man had the negro in the lapel of his coat, coming along in this direction, and he was walking along with the negro and had him in the lapel of the coat, and they walked up in front of this store, and then the plain-clothes man turned around this way, and the negro slightly that way, and about then the negro made a motion in his clothes and got his left hand this way [indicating], like this was the plain-clothes man on this side, the negro was working his hand that way, and before I could yell to him he just shot—shot the man in the abdomen somewhere. At the time the negro was working in his clothes and before he shot, Mr. Gunn had hold of the negro's lapel on his coat in his left hand. I didn't see what his right hand was doing; he did not have anything in it; it was just lax, like you let your hand fall down you know. I did not see the negro's pistol at the time. I saw it as he ran down Augusta Avenue; he had something in his hand; I presume it was a gun. Immediately after this shot, the negro ran south on Augusta Avenue, and Mr. Gunn fell immediately to the ground. . . At the time I describe Mr. Gunn having hold of him, and as he turned his head and I saw him shoot, Mr. Gunn was not doing anything to this negro, except holding on to him by the lapel of his coat. I did not see Mr. Gunn attack him in any manner. I did not see him kick him or try to shoot him in any manner. At the time Mr. Gunn was shot his face was turned away from the negro towards Sheehan's store, I believe it was, at that crossing. That happened in this State and county. . . When Gunn fell his gun wasn't on the ground; it was in his hand. You want me to tell you exactly Gunn's position when he fell? Well, Gunn reeled. This shot paralyzed him, or something. He turned white and he turned green, and I was the first one to him. I rushed up to him, and just as I got there he had his gun drawn. He did not draw it until he fell, you understand. It was a long gun and was brown in color and had a walnut handle or a brown-colored handle."

M. C. Haynie, for the State, testified: "I know that fellow, Arthur Meyers. I saw him first on the night of September 16, 1928, at 4207 Langley Avenue, Chicago, Illinois. I was there for the purpose of helping get him to bring him back here; and I did get him. When I got him he was at an apartment house, 4207 Langley Avenue, Chicago. It was at night, and he was in bed. Well, this was a big apartment house, and there were several of us officers there. I was there with Sergeant Holley of the city police department of Augusta, and the Chicago detectives, Frank Kriz and William McGowen, and there were several other Chicago detectives there, but they wasn't all in the house. Some of them was on the outside of this house, and one of the men called me and said, 'Come here, Haynie.' I was over on the east side of the house, and I walked over there, and they were already in the room where he was. And I walked in, and Arthur Meyers was standing up between the bed and a closet door, and one of the men turned to me —I couldn't remember which one it was, for some of them I didn't know—and says, 'This is him, ain't it?' and I said, 'Yes.' He started in the closet, and I told him to come out. There were several men in there at that time, searching the room, and a Chicago man standing by me. I don't remember his name. He said, 'Meyers, we are watching you now, and if you make any crooked move now we are going to kill you right here in this room.' He looked at him and said: 'Well, you better watch me. I just as soon die now as at any other time.' That is about all he said."

C. U. Hammett, a witness for the State, testified: "I knew Mr. Gunn. He was special agent with the Georgia Railroad at the time of his death. His duties as special agent were to break up trespassing, riding trains, and prevent robberies. I recall the day he got shot. I saw him in the hospital. I reckon it was about two hours and a half after that shooting. Well, he looked like he was suffering a great deal when I saw him, and I went in the room where he was, and he said, 'Hammet, I am living on borrowed time.' He said, 'I have got to die.' He said, 'I didn't want to leave my family now until I fixed them better financially, but,' he said, 'Hammett, I have got to go;' and another thing he said, 'I didn't abuse the negro. I didn't abuse him in any manner. I only told him it was against the law to ride the train, and I told him that I would have to send him to the barracks;' and about that

time I was called to the telephone up in the office at the hospital, and I left him and when I got back to the room they had sent him upstairs to the operating table. As to anything further that the man said to Mr. Gunn or Mr. Gunn said to him, Mr. Gunn stated, 'I didn't mistreat the negro, and I told him I would have to send him to the barracks,' and said, 'Your fine won't be more than a dollar or five dollars, or ten days.'"

The defendant made the following statement, in part: "Gentlemen of the jury, on the 6th of March, 1924, I was coming from work and I had walked from Perkins Manufacturing Co. up to Steedley's Crossing when this train overtaken me. Well, I stood right in the middle of the street-car track where the street-car crosses the railroad. There is where I stepped on the train; and that is the truth, so help me God. As I stepped on the train this train come to a stop. Now when I stepped on the train and this train come to a stop and this man was standing on what you might call the left-hand side, the way the train was running, but they said the train was backing, and that throwed it to be the right, but it was on the left-hand side the way the train was going up to the yard, and when I stepped on the train he pushed me from the train and did not change no words with me. Did not say nothing about 'I am going to arrest you, I am an officer of the law,' or nothing, but he commenced to beating me, kicking me, and he fought me from the railroad-crossing down in front of this store and I got down in front of this store he was continuing to beat me. Well, I wheeled to him, swung to my left, held my hands up to protect his blows. When I wheeled to protect his blows he grabbed his gun, just so. Well, I come right here and gets my gun and fired one shot; then I ran out."

From the evidence we are of the opinion that the jury were authorized to find the defendant guilty, without recommendation.

■ The first special ground of the motion for new trial is as follows: "Because the court erred in ruling movant to strike the jury from a list of 48 jurors not placed upon him as required by section 997 of the Penal Code, in that he failed to require the clerk, after he had made out three lists of said 48 jurors and furnished one to the prosecuting counsel and one to the counsel for the defense, to 'call over the panel' of jurors and put the same immediately upon him as provided in [the section cited], . .

over the timely objections then and there urged by defendant's counsel that they waived nothing and were standing on their legal rights, as will be seen from the following colloquy between counsel for the defense, counsel for the State, and the court: Immediately after formal arraignment had been waived and a plea of not guilty had been entered by defendant, the solicitor started to administer the voir dire oath to the jurors, but was stopped by counsel for the defense: 'Wait, wait, you are not proceeding under the law, Captain. We want a list of the jury.' The solicitor replied, 'I am not doing that yet. I am only swearing them on the voir dire.' To this defendant's counsel replied: 'You had better not do that. You had better proceed under the law and give us a list.' The court then ordered the jury to sit down. After some delay a list consisting of forty-seven jurors numbered from 1 to 39, and thence from 30 to 37, was furnished counsel, and the solicitor administered the voir dire oath to these jurors; whereupon counsel for the defense stated: 'If your honor please, my brother is not proceeding orderly or legally. We are respectfully standing on our legal rights.' To which the court replied: 'Arraign him;' whereupon defendant's counsel stated: 'He has waived arraignment and pleaded not guilty.' The court replied: 'All right. Go ahead.' Counsel for the State, addressing the clerk, then stated: 'Call the first juror, Mr. Clerk.' In response to this statement, defendant's counsel stated to the court: 'All right. I have a challenge to the array,' and the court inquired: 'Where is it?' to which defendant's counsel replied: 'I am preparing it. The conditions have arisen since the list was handed to me. We ask for a little time to prepare it, or I can dictate the skeleton of it to the stenographer.' The court replied: 'All right. Go ahead and dictate the skeleton,' and counsel for the defense did then and there dictate a challenge to the array, attacking the panel of jurors, but in which said plea it was expressly declared by defendant's counsel that the same was done *without waiving the call of the jury;* and to show that the call of the jury was not waived, movant attaches a copy of such plea to this ground of his motion for new trial, marks the same Exhibit No. 1, and by reference thereto makes it a part hereof, to which is attached, as Exhibit A, a verbatim copy of the colloquy between the court, counsel for the State, and counsel for movant, showing just what took place at this stage of the trial. After the delay

incident to the dictation of the plea, defendant's counsel stated to the court: 'Defendant in open court, when said case was sounded, and after pleading, entered a demand for a full panel, and that only 37 jurors, consisting of a list made up promiscuously from said list of 72 jurors was furnished defendant.' And the court inquired, 'Only how many?' to which counsel for the defendant replied: '37 of the 72;' whereupon the court stated: 'Get up some jurors to make 48. Now we will have 48. Now is there anything else?' Defendant's counsel stated: 'Those are the facts. I want to enlarge on my conclusions from those facts.' To which the court inquired: 'Have you any other facts?' Defendant's counsel stated: 'I am prepared to prove the facts. I want to put the clerk on the stand to prove those facts.' Whereupon the court stated: 'Well, you say you only have a panel of 37?' To which defendant's counsel replied: 'Yes, sir.' The court stated: 'We will give you a panel of 48.' And after some further discussion with reference to the excuse of certain jurors, the following took place: The court stated to the sheriff: 'Mr. Sheriff, pick up a few jurors to complete this panel.' After some delay a number of tales jurors appeared in court, and the following took place: The clerk stated: 'Gentlemen, please answer to your names;' and the court stated also, 'Answer to your names, gentlemen, as your names are called.' The names of the following thirteen tales jurors were called: Jesse V. Johnson, F. J. Willingham, Wm. Belding, Jno. A. Brewer, James Yaun, W. T. Garrett, H. E. Edenfield, Thos. K. Clary, Joseph E. Dewitt, H. E. Cartledge, T. J. North, Ira C. Whittle, and M. G. Ridgley. The court then inquired: 'How many answered?' and the clerk replied: 'We have 10 that answered and we have 2 on the way here.' To which the court replied: 'All right, sir, let us know when the two come. That will give us a panel. We only need 11. 11 will give us a panel.' The clerk then gave a list of the jurors to defendant's counsel. The solicitor administered the voir dire oath to the jurors, and asked that if any were related to the deceased or the prosecutor they make that fact known when their names were called, and the court stated: 'All right. You now have a list of 48?' To which defendant's counsel replied: 'Yes, sir.' And the court directed: 'Go ahead.' To which defendant's counsel responded: 'Still standing on our legal rights and not waiving anything.'

Thereupon, the clerk obeying the order of the court and without calling over the panel of 48 jurors, and without the panel being put upon the accused, the striking of the jury proceeded until 10 jurors were selected. The error complained of being: (a) That the clerk did not comply with the mandatory requirement of the statute and call over the panel. (b) That the court did not comply with the mandatory requirement of the statute and immediately put the panel upon the accused. (c) That such failure to comply with the requirements of the statute is such a violent deprivation of defendant's rights as to make the subsequent proceedings in said case a nullity, and the verdict of such jury should be set aside." Ground 2 is substantially the same as ground 1, and they will be considered together.

We are of the opinion that these grounds of the motion for a new trial do not show harmful error as against the defendant. See *Cason* v. *State,* 134 *Ga.* 786 (68 S. E. 554); *Woolfolk* v. *State,* 85 *Ga.* 65, 88, 90 (11 S. E. 814); *Kirksey* v. *State,* 11 *Ga. App.* 142 (74 S. E. 902). The court below, in overruling the challenge to the array, said: "All of the jurors served by the sheriff who did not appear were excused by the court for good and sufficient reasons made known to the court by each of the jurors." It has been held: "That some of the jurors drawn, but not impaneled, were excused by the court for causes not expressly provided for by statute, is not ground for challenge to the array." *Fulton County* v. *Amorous,* 89 *Ga.* 614 (2) (16 S. E. 201). The presumption is that a trial judge has a legal reason for excusing jurors where he has done so. *Benford* v. *State,* 18 *Ga. App.* 14, 15 (88 S. E. 747). The language of the challenge is, "without waiving the call of the jury," but nothing is alleged about not waiving the putting of the panel of jurors on the defendant, which is not the equivalent of objecting, or waiving the right of putting the panel on the defendant. In the case of *Cumming* v. *State,* 155 *Ga.* 346 (117 S. E. 378), defendant's counsel stated in open court that "The defendant waives nothing and stands on his entire legal rights." It was held in that case that the defendant would not be heard to say after conviction that the panel of jurors was not properly put upon him. It is true that in the *Cumming* case there was no challenge to the array; but we are of the opinion that in the instant case the challenge had no reference to the omission complained of in grounds we are consider-

ing. It appears that a list of the jurors on the panel was furnished to counsel for the defendant. His challenge to the array stated that the panel was put on him, and he made no objection to the manner of putting the panel on him. It appears that each juror was called as he was put upon his voir dire, and the defendant had opportunity to see and to interrogate the juror. We are of the opinion that neither ground shows that the defendant has been deprived of any substantial right.

■ Ground 3 assigns error upon the following charge of the court: "I charge you, gentlemen, this section of the code: That if any person shall ride or attempt to ride on a railroad-train of any character, who conceals himself from the conductor or train authorities, by hiding under the train, or upon the top of the train, or in box-cars, on tenders, or elsewhere, for the purpose of stealing a ride thereon, he is guilty of a misdemeanor. If you believe, gentlemen of the jury, that the defendant was guilty of a misdemeanor under that section of the code, then I charge you this section of the code: That a private person may arrest an offender, if the offense is committed in his presence or within his immediate knowledge. So that, gentlemen of the jury, if you believe from the evidence, as well as the prisoner's statement, that this defendant on that occasion was guilty, under that section of the code that I have given you, of riding upon that train, and you believe the deceased arrested him for that purpose and for that reason, he would have had a right to arrest him; and if you further believe, gentlemen of the jury, from the evidence and the prisoner's statement in this case, that the defendant killed him for the purpose of repelling a legal arrest, if it was legal, then he would be guilty of murder." The error alleged in the foregoing charge is, that there was no evidence which proved that the defendant was, at the time of the shooting, guilty of stealing a ride upon a railroad-train, but that, on the contrary, the evidence demanded a finding that no crime was being committed, and to charge the jury as quoted was to charge them upon a question which was not properly involved in the case; and further, that under the evidence the charge was confusing to the jury, in that it injected into the case an issue that was not in it, and left the jury under the impression that there were facts in the evidence which would authorize them to find that movant was guilty of a crime, when the deceased sought to arrest him, and that there-

fore the deceased had a right to arrest movant, when, as he contends, all of the evidence negatives such an idea.

In connection with this ground it is pertinent to consider grounds 4 and 5, which are as follows: (4) Because the court erred in charging the jury as follows: "I charge you, gentlemen of the jury, that under the section of the code that I have read to you, regarding persons riding on a train, the gist of that offense is that of concealing himself, and if you believe, gentlemen of the jury, that this defendant attempted to ride or did ride on a railroad train of any character and concealed himself from the conductor or train authorities by hiding under the train or on top of the train or in a box-car, on tenders, or elsewhere, for the purpose of stealing a ride, he would be guilty under that section, and any private person in that event, and this deceased in that event, would have had the right to arrest him for it." (5) Because the court erred in failing to give in charge to the jury the following pertinent instruction duly requested: "I further charge you, gentlemen of the jury, that it is a crime for a person to ride or attempt to ride on railroad train of any character, who conceals himself from the conductor or train authorities by hiding under the train, or upon the train, or in box-cars, on tenders, or elsewhere, for the purpose of avoiding payment of fare, or of stealing a ride thereon, he shall be guilty of a misdemeanor; but, I charge you, that in order for a person to be guilty under this section of the code, the gist of offense is that of concealing himself, and if you believe from the evidence that the defendant in this case did conceal himself upon such railroad train, or engine, or tender thereof, for the purpose of stealing a ride, he would be guilty of a misdemeanor and the deceased would have a right to arrest him without a warrant, but if you believe from the evidence that the defendant jumped upon the tender of the engine, in the presence of the deceased and in the presence of the other train crew, this would not constitute a crime under this provision of our law, and for the deceased to have attempted to arrest the defendant under such circumstances, such arrest would be illegal and the defendant would have had the right to repel such arrest by the use of such force as was necessary to do so." We are of the opinion that there is no merit in grounds 3, 4, and 5. The defendant can not invoke a charge of the court and have it substantially given, and then complain that the charge as given is with-

out evidence to support it. *Howard* v. *State,* 115 *Ga.* 244 (4), 251 (41 S. E. 654, 90 Am. St. R. 121); *Qualllebaum* v. *State,* 119 *Ga.* 433 (3) (46 S. E. 677); *Partee* v. *State,* 19 *Ga. App.* 752, 756 (92 S. E. 306).

■ Ground 6 of the motion for new trial is as follows: "Because the court erred in failing to charge the jury the section of the code defining the punishment for murder, which is section 63 of the Penal Code [quoting it]; and otherwise failed to instruct the jury the law with reference to their right in determining whether or not they would recommend the defendant to mercy—the only reference thereto being contained in one of the forms of verdict which the court instructed the jury they might return, to wit: 'We, the jury, find the defendant guilty, and recommend that he be punished by confinement in the penitentiary for life.' But movant says that this was not sufficient, because, (a) under the law defendant was entitled to have the above quoted section charged, either literally or in substance, or the jury otherwise instructed in plain English their right as to recommendation to mercy, and to fail to do so was harmful error, requiring the grant of a new trial." This ground is without merit. *Morrow* v. *State,* 168 *Ga.* 575 (148 S. E. 500).

■ Ground 7 is that the court erred in charging the jury as follows: "Gentlemen of the jury, I have written out four possible forms of verdict. After you consider the case, one of your number, selected for that purpose, select the one that you think adjustable and adjusted to the facts of the case, write it on the back of the bill of indictment, and return it into court as your verdict. First: 'We, the jury find the defendant not guilty.' Second: 'We, the jury, find the defendant guilty,' in which event death would be his punishment. Third: 'We, the jury, find the defendant guilty, and recommend that he be punished by confinement in the penitentiary for life,' in which event that would be his punishment; or, 'We, the jury, find the defendant guilty of manslaughter, and fix his punishment at not less than' a year or so many years, and not more than a year or so many years, 'in the penitentiary,' within the limits of one to twenty years, you fixing the maximum and minimum punishment within those limits. Retire, gentlemen, and make up your verdict." The errors complained of are: (a) "Because said charge was misleading, in that it in effect told the jury to 'select'

one of its number 'for that purpose' and have him 'select' the verdict which he thought 'adjustable and adjusted to the facts of the case;' and while it may have been, and no doubt was, the intention of the court by the language used to state to the jury to select one of its number as foreman and for him to write out the verdict of the jury, but this was not what the court said. (b) Because to charge the jury, 'I have written out four possible forms of verdict. After you consider the case one of your number, selected for that purpose [not "selected as foreman for that purpose"], select the one that you think adjustable and adjusted to the facts of the case, write it on the back of the bill of indictment and return it into court as your verdict,' was confusing to the jury; whereas movant was entitled to have the jury informed clearly and distinctly in plain language, and not in language that was misleading and confusing, with reference to the character of verdict they could return, or the punishment they might inflict. (c) Because said charge was misleading, in that it told the jury to 'select' the verdict that they thought 'adjustable and adjusted to the facts of the case,' and this referred to all the verdicts which the court had prepared, and it in effect told the jury that in fixing the punishment, in the event the jury convicted, it was bound to adjust this part of their verdict to the facts, whereas this was something which lay wholly within the conscience of the jury and which need not be 'adjustable and adjusted to the facts,' and it was error to so instruct them; it charged the jury to adjust the question of punishment to the facts, and that the facts had to be 'adjustable' thereto, or the same had to be 'adjusted' to the facts, when as a matter of law this was something altogether within the hearts, judgment, and conscience of the jury without regard to the facts. (d) Because to charge the jury as quoted with reference to punishment was to, and did, restrict the jury in its right to recommend to mercy, because it left upon their minds the impression that the question of punishment as well as of guilt had to be 'adjustable and adjusted to the facts,' when this is not the law; the jury had a right to recommend to mercy without regard to whether such recommendation was 'adjustable and adjusted to the facts'—they could do so with or without a reason or arbitrarily if they so desired; and for the court to restrict them in its charge with regard thereto was error requiring the grant of a new trial. (e) Because to charge: 'Gentlemen of

the jury, I have written out four possible forms of verdict. After you consider the case, one of your number, selected for that purpose, select the one that you think adjustable and adjusted to the facts,' was to convey to the jury the idea that the one so 'selected' was to 'select' the form of verdict that should be returned. In other words, to so inform the jury was to leave the punishment to be inflicted upon the defendant in the hands of one of its number, if the literal language of the court was to be followed; and if not, it was certainly ambiguous, misleading, and confusing. (f) Because the charge quoted was in effect to charge the jury that if 'you think' this verdict, 'we the jury, find the defendant guilty, and recommend that he be punished by confinement in the penitentiary for life, adjustable and adjusted to the facts of the case,' then have 'one of your number, selected for that purpose,' select it and 'write it on the back of the bill of indictment and return it into court as your verdict.' And movant says that such language necessarily meant that the question of punishment must be 'adjustable and adjusted to the facts of the case,' when, under the law, the jury should have been left unrestricted as to their right and power to recommend the defendant to mercy; whereas the charge quoted circumscribed and restricted it with reference thereto, and required the jury to make their recommendation dependent upon the facts, or make the same 'adjustable and adjusted to the facts of the case.'"

This ground will be considered in connection with ground 9, which is substantially the same, but gives different reasons for asking for a new trial. Error is assigned in that such charge expressed an opinion to the jury that from the evidence before them they could find the defendant guilty, or not guilty, or guilty with recommendation, or that they could find the defendant guilty of manslaughter, etc. It is contended that the portion of the charge, "that you think adjustable and adjusted to the facts," when the law did not restrict the jury in their power to recommend the defendant to imprisonment for life, was error. Plaintiff in error cites the case of *Hill* v. *State*, *72 Ga.* 131, where the judge charged the jury, in considering the question of recommending to mercy, that they "should not be governed by their sympathies, but by their judgment proved by the evidence in the case and the law applicable to it." The charge in that case restricted the power of

the jury. But in the present case we do not think that the charge complained of restricted the power of the jury to recommend the defendant to imprisonment for life. See *Inman* v. *State,* 72 *Ga.* 269; *Valentine* v. *State,* 77 *Ga.* 470. For a full discussion of the cases bearing upon this question see *DuPre* v. *State,* 153 *Ga.* 798 (10), 808 (113 S. E. 428). These grounds of the motion for new trial are without merit.

■ Ground 8 complains that under no phase as given in charge by the court, and the evidence, could the jury have found the defendant guilty of any offense higher than that of manslaughter. Conceding that the jury might, under the evidence and the charge, have found the defendant guilty of manslaughter, yet under the facts they were authorized to find the defendant guilty of murder. The charge of the court, as a whole, was very favorable to the defendant. The court gave the defendant the benefit of every defense he might have under the evidence. He charged, among other things: "Did he kill him in his own self-defense? If he did so, he is not guilty. Or, did he kill him under the fears of a reasonable man that some bodily harm was about to be done him, amounting to a felony, and he really acted under the influence of those fears and not in a spirit of revenge? If so, he is justifiable. Or, did he kill him to repel an illegal arrest with whatever force was necessary? and if he killed him with the force that was necessary to repel an illegal arrest and he killed him for that purpose, he is not guilty. Or, did he kill him to repel an illegal arrest, and it was not necessary to kill a man to repel an illegal arrest, or kill him in that instance? Then he would be guilty of manslaughter. Or, did he kill him under a sudden heat of passion, supposed to be irresistible, as I shall define voluntary manslaughter to be? If he did, he would be guilty of manslaughter. I charge you, gentlemen, this section of the code: That if any person shall ride or attempt to ride on a railroad-train of any character, who conceals himself from the conductor or train authorities, by hiding under the train, or upon the top of the train, or in box-cars, on tenders, or elsewhere, for the purpose of stealing a ride thereon, he is guilty of a misdemeanor. If you believe, gentlemen of the jury, that the defendant was guilty of a misdemeanor under that section of the code, then I charge you this section of the code: That a private person may arrest an offender, if the offense is committed in his presence or

within his immediate knowledge. So that, gentlemen of the jury, if you believe from the evidence, as well as the prisoner's statement, that this defendant on that occasion was guilty, under that section of the code that I have given you, of riding upon the train, and you believe the deceased arrested him for that purpose and for that reason, he would have had a right to arrest him; and if you further believe, gentlemen of the jury, from the evidence and the prisoner's statement in this case, that the defendant killed him for the purpose of repelling a legal arrest, if it was legal, then he would be guilty of murder. I charge you, gentlemen of the jury, if you should believe from the evidence that this defendant was not then and there guilty of riding on a train, as I have defined that violation of law to be in the section which I have read, 717 of the code, and this defendant arrested him for so doing, it would be an illegal arrest, and in that event the defendant would have a right to repel that illegal arrest with whatever force was necessary, and if he did so he would be justifiable. I charge you, however, gentlemen of the jury, that if you believe that that was an illegal arrest and that this defendant used more force than was necessary to repel that arrest, and that it was not necessary to take the life of the deceased to repel the illegal arrest, then in that event he would be guilty of manslaughter. Now I charge you, gentlemen of the jury, that whether he was arrested legally or illegally, and while so arrested that the deceased endeavored to take the life of the defendant, the defendant would have the right to defend himself, even to the taking of the life of the deceased. I charge you, gentlemen of the jury, that whether the arrest was legal or illegal, if the deceased by his conduct towards the defendant created in the defendant the fears of a reasonable man that some bodily harm was about to be done him, amounting to a felony, and the defendant really acted under the influence of those fears and not in a spirit of revenge, he would be justifiable; and a seeming necessity, when acted upon in good faith, is the equivalent of a real necessity. So that, gentlemen of the jury, you must determine from the evidence as well as the prisoner's statement just what was his mind, what was his urge, what moved him in shooting and killing the deceased. I charge you, gentlemen of the jury, that under the section of the code that I have read to you, regarding persons riding on a train, the gist of that offense is that of concealing himself; and if you

believe, gentlemen of the jury, that this defendant attempted to ride or did ride on a railroad-train of any character and concealed himself from the conductor or train authorities by hiding under the train, or on top of the train or in a box-car, on tender, or elsewhere, for the purpose of stealing a ride, he would be guilty under that section; and any private person in that event, and this deceased in that event, would have had the right to arrest him for it."

■ The court did not err in refusing a new trial.

*Judgment affirmed. All the Justices concur, except Russell, C. J., and Atkinson, J., who dissent from the ruling in the second division of the decision.*